UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| ING BANK N.V. | CIVIL ACTION |
| v. | NUMBER: 2:16-cv-01003 |
| M/V CHARANA NAREE, IMO No. 9296303, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem* | JUDGE JAMES D. CAIN, JR. |
| | MAGISTRATE JUDGE KAY |
| | ADMIRALTY |

## MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND/OR PARTIAL SUMMARY JUDGMENT

PHELPS DUNBAR LLP

Kevin J. LaVie (#14125)
Magdalini Galitou (#38473)
Canal Place • Suite 2000
365 Canal Street
New Orleans, Louisiana 70130-6534
Telephone: (504) 566-1311
Telecopier: (504) 568-9130
kevin.lavie@phelps.com
magdalini.galitou@phelps.com

ATTORNEYS FOR DEFENDANT,
PRECIOUS VENTURES LIMITED

# TABLE OF CONTENTS

I. Background ................................................................................................ 1
II. Law and Analysis........................................................................................ 4
    1. Any assignment of rights from O.W. Bunker to ING is unenforceable to the extent it includes a maritime lien and the ancillary right to an *in rem* action. ....................................... 5
    2. O.W. Bunker specifically agreed to waive claims such as this in exchange for renewing business with PVL............................ 6
    3. U.S. law, including U.S. maritime lien law, does not apply to this case................................................................................... 9
    4. Even if U.S. maritime lien law applies, the lien here was lost due to laches. .................................................................... 11
    5. Even if, which is denied, plaintiff has a right to pursue a U.S. maritime lien, the lien does not extend to attorneys' fees or interest. .................................................................................. 13
III. Conclusion................................................................................................ 14

## **TABLE OF AUTHORITIES**

Page(s)

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ................................................................................................ 5

*Creek Marina v. Vessel My Girls*,
   964 F. Supp. 20 (D.D.C. 1997) ............................................................................. 14

*Donaghey v. Ocean Drilling & Exploration Co.*,
   974 F. 2d 646 (5th Cir. 1992) ................................................................................. 5

*Equal Emp't Opportunity Comm'n v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991) .............................................................................................. 11

*Galveston Yacht Serv. Inc. v. Yacht Patricia*,
   1984 AMC 1719, 1981 WL 463 (S.D. Tex. 1981) ................................................ 14

*Gulf Coast Trading & Transp. O. v. Vessel Hoegh Shield*,
   658 F.2d 363, 1982 AMC 1139 (5th Cir. 1981) ..................................................... 9

*Gulf Marine & Indus. Supplies*,
   1999 U.S. Dist. LEXIS 11500, 1999 WL ............................................................. 14

*Gulf Marine & Indus. Supplies, Inc. v. Golden Prince M/V*,
   230 F.3d 178, 2001 AMC 817 (5th Cir. 2000) ..................................................... 14

*Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*,
   2016 U.S. Dist. LEXIS 51568 (S.D.N.Y. Apr. 6, 2016) ......................................... 12

*Martin v. John W. Stone Oil Dist., Inc.*,
   819 F. 2d 547 (5th Cir. 1987) ................................................................................. 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
   475 U.S. 574, 106 S. Ct. 1348 (1986) .................................................................... 5

*Neftehim Bunker, J.S.C. v. Ridgebury Nicholas MV*,
   2017 AMC 84 (E.D.La. 2016) .............................................................................. 11

*O.W. Bunker Malta Ltd. v. M/V TROGIR*,
   602 F. Appx. 673 (9th Cir. 2015) .......................................................................... 10

*Rainbow Line Inc. v. M/V Tequila*,
   480 F. 2d 1024, 1973 AMC 1431 (2d. Cir. 1973) (relying on the multi-
   factor choice-of-law analysis in *Lauritzen v. Larsen*, 345 U.S. 571,
   1953 AMC 1210 (1953)) .................................................................................. 10

*World Fuel Servs. Sing, Pte, Ltd. v. Bulk Juliana M/V*,
   822 F.3d 766, 2016 AMC 2723 (5th Cir. 2016), *petition for cert. denied*
   137 S. Ct. 2290 ( U.S. June 26, 2017) ................................................................ 11

**Statutes**

46 U.S.C.S. § 31301 of the Federal Maritime Law Act .................................................. 14

Commercial Instruments and Maritime Liens Act ......................................................... 14

FMLA ..................................................................................................................... 14, 15

**Other Authorities**

Fed. Rule Civ. Pro. 56(c) ................................................................................................. 4

THOMAS, BRITISH SHIPPING LAWS VOL. 14 ........................................................................ 6

Chelsea Crews, *The Liening Tower of Precedent: The Fifth Circuit Further
   Fractures Consensus on Choice-of-Law Clauses Governing Maritime
   Lien in World Fuel Services Singapore Pte, Ltd. v. Bulk Juliana M/V*, 41
   TUL. MAR. L.J. 585 (2016-2017) ...................................................................... 10

Mark S. Davis & Jonathan T. Tan, *To Port or Starboard? Why the
   Supreme Court Might Provide Direction to Those Navigating Choice-of-
   law Questions in Maritime-Lien cases: The 2015 Nicholas J. Healy
   Lecture,* 46 J. MAR. L. & COM. 395, 418, 458 (2015) .................................... 10

Martin Davies, *Choice of Law and U.S. Maritime Liens,* 83 Tul. L. Rev.
   1435, 1446 (2009) ............................................................................................. 10

*Tulane University,* 42 TUL. MAR. L. J. 269 (2017-2017) ............................................... 11

*27th Biennial Admiralty Law* .......................................................................................... 11

MAY IT PLEASE THE COURT:

The following Memorandum is submitted by Precious Ventures Limited ("PVL"), *in rem* claimant of the M/V CHARANA NAREE, in support of its Motion for Summary Judgment and/or Partial Summary Judgment.

**I. BACKGROUND**

This action was commenced by the filing of a Verified Complaint by ING Bank N.V. ("ING") against the M/V CHARANA NAREE (the "Vessel"), *in rem*. The Vessel was arrested under process issued by this court and was held under arrest until substitute security consisting of a cash deposit into the court registry of $310,102.98 was made on behalf of the Vessel.

The Verified Complaint seeks payment for fuel oil, also known as bunkers, delivered to the Vessel. The bunkers were actually provided to the Vessel by Vemaoil Company Limited ("Vemaoil"), which was a sub-contractor of Macoil or, per paragraph 7 of Macoil's Intervening Verified Complaint (R.Doc. 29), the "delivery agent." Macoil has filed an Intervening Verified Complaint and Cross-Claim against ING Bank N.V. (R. Doc. 29) also seeking payment for the same bunkers. Macoil alleges it was the actual physical supplier of the bunkers, although the bunker delivery receipt identifies Vemaoil as the supplier. (See Vemaoil Bunker Delivery Receipt (Exhibit "A.")

The bunkers were not ordered by the Vessel or her owner, but were instead ordered by a time charterer of the Vessel, Copenship Bulkers A/S ("Copenship").[1] Paragraph 9 of the Verified Complaint (R. Doc. 1) confirms that the bunkers were ordered by "Copenship, the charterers of the CHARANA NAREE at the time." A sales

---

[1] A time charterer essentially leases the vessel (with her crew) and often supplies the fuel oil for the voyages arranged by same.

order confirmation, attached hereto as Exhibit "A" to the Verified Complaint, also confirms that the bunkers were ordered by Copenship. Neither the Vessel nor her owner was involved in this transaction, and the Vessel owner has no relationship to Copenship except for the arms-length time charter agreement.

ING purports to derive its maritime lien-holder status based on an assignment from O.W. Bunker & Trading A/S ("O.W. Bunker") governed by English law (see certain English Omnibus Security Agreement dated December 19, 2013 ("Security Agreement") attached as Exhibit 18 to R.Doc. 72.) In other words, the question whether ING can recover from the Vessel and her owner is a question of English law and as discussed further below, it appears that under English law a maritime lien is not transferable.

Nevertheless, ING improperly attempts to enforce the terms and conditions of a contract between O.W. Bunker and Copenship against the Vessel and her owner. ING also improperly contends that the terms and conditions applicable to the bunker sale agreement between O.W. Bunker and Copenship, including the governing law (choice-of-law provisions), extend to ING's alleged claim against the Vessel.

The bunkers in question were ordered by a non-U.S. charterer, Copenship, from a non-U.S. bunker broker, O.W. Bunker & Trading A/S ("O.W. Bunker"). (Complaint, ¶9.) The bunkers were delivered to the Vessel in Gibraltar. (Complaint, ¶17.) There is a complete absence of U.S. contacts in the sale and supply of the bunkers, and a complete lack of privity of contract between ING and the Vessel. Plaintiff nevertheless seeks to use the general terms and conditions of O.W. Bunker to assert a lien under U.S. maritime law against the third-party the Vessel. This should not be allowed.

Further, Plaintiff seeks to recover from the owner of the vessel usurious interest of 3% per month (Complaint, ¶18), a "delayed payment administrative fee" of $1.50 per metric ton (Id.) and attorneys' fees and costs (Complaint, ¶19). While these unconscionable contractual penalties might *possibly* be recoverable from the party to the contract, assuming ING has standing —which is denied— they certainly cannot be recovered under a maritime lien even if —which is denied— one exists.

PVL moves for summary judgment on the following grounds:

1. ING has no standing to bring a claim against the Vessel and her owner because any assignment of a maritime lien and the ancillary right to an in rem action from O.W. Bunker to ING is unenforceable as maritime liens are not transferable under English law;

2. Prior to the supply of bunkers to the Vessel, O.W. Bunker specifically agreed that it would not arrest PVL vessels for non-payment by charterers of PVL vessels; this agreement was given in consideration for the commitment by PVL to use O.W. Bunker when ordering bunkers for PVL's own account;

3. There is no basis for U.S. law to apply to this foreign transaction and, therefore, no basis for a maritime lien against the vessel under U.S. law;

4. Even if U.S. law applies, which is denied, any lien ING held was lost through the doctrine of laches; specifically, ING delayed nearly two years before filing its lien claim and during this time, charterer Copenship went into bankruptcy, prejudicing PVL's ability to recover from Copenship;

5. If U.S. law applies and if this lien has not been lost due to laches, which is denied, plaintiff is still prohibited from recovering contractual interest, administrative

fees, and contractual attorneys' fees from parties other than the party which contracted with O.W. Bunker.

## II. LAW AND ANALYSIS

Summary judgment should be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[2] In *Celotex Corp. v. Catrett*, the Supreme Court held that summary judgment must be granted if the non-movant fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.[3] The Court reasoned that in such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

The party opposing the motion "must come forward with specific facts showing that there is a genuine issue for trial."[4] But "the mere existence of a scintilla of evidence" in support of the non-moving party is not sufficient to show a genuine issue of material

---

[2] Fed. Rule Civ. Pro. 56(c).

[3] *Celotex Corp.*, 477 U.S. 317, 322 (1986).

[4] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986). *Donaghey v. Ocean Drilling & Exploration Co.*, 974 F. 2d 646, 649 (5th Cir. 1992); *Martin v. John W. Stone Oil Dist., Inc.,* 819 F. 2d 547, 549 (5th Cir. 1987).

fact.[5] So, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate.[6]

As shown below, PVL is entitled to summary judgment as a matter of law and there are no genuine issues of material facts as to the following:

**1. Any assignment of rights from O.W. Bunker to ING is unenforceable to the extent it includes a maritime lien and the ancillary right to an *in rem* action.**

ING asserts that it is the assignee of all of O.W. Bunker's rights, title and interests in certain assets, including customer accounts receivable for bunker deliveries and the amounts owed to O.W. Bunker for same under a certain Security Agreement (R. Doc. 1 ¶4, 6). According to ING, this assignment includes the right to institute this action and enforce its alleged maritime lien against the Vessel, in the amounts owed to O.W. Bunker for bunkers delivered to the Vessel (R. Doc. 1, ¶3-7).

Clause 20 of the Security Agreement titled "Governing Law" contains a choice of law provision and calls for the application of English law to "the Security constituted hereunder and any non-contractual obligation arising out of or in connection with [that] Deed."

ING's right to a maritime lien is solely based on the purported assignment from O.W. Bunker of its rights, title and interests arising out of the contract for the delivery of bunkers between O.W. Bunker and Copenship. In other words, if the assignment of those rights is not valid, ING has no standing to assert a maritime lien against the Vessel.

---

[5] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252 (1986).

[6] *Id.* at 249-50.

5

Under English law, there is a long established view that a maritime lien is a personal and non-transferable privilege.[7] Because the Security Agreement between ING and O.W. Bunker is governed by English law, any assignment of a maritime lien and its ancillary right to an *in rem* action from O.W. Bunker to ING is ineffective and thus, unenforceable. As such, ING has no standing to assert a maritime lien against the Vessel.

In the unlikely event that it is found that there is factual dispute as to the ineffectiveness of O.W. Bunker's assignment to ING, which is specifically denied, PVL further asserts the following:

**2.     O.W. Bunker specifically agreed to waive claims such as this in exchange for renewing business with PVL.**

By filing this action against the Vessel, Plaintiff ING violated an agreement between O.W. Bunker and Precious Shipping Public Company Limited, Thailand ("PSL"), the parent company of PVL.

By way of background, bunker suppliers are well aware of the fact that bunkers are often ordered by charterers of vessels. They are also aware that most charter parties contain "no lien" clauses which prohibit charterers from incurring liens which can be asserted against the vessel. Despite this, bunker suppliers attempt to ignore these matters and seek recovery from vessel owners or vessels *in rem* for bunkers ordered by charterers.

This is not the first time that PSL was called to pay an outstanding invoice for bunkers delivered to one of its Vessels on the order of her charterers. Specifically, O.W. Bunker group, through the manager of its legal department, Claus E. Mortensen,

---

[7] D.R. THOMAS, BRITISH SHIPPING LAWS VOL. 14 MARITIME LIENS (1980).

repeatedly demanded payment from PSL and its vessel APISARA NAREE for bunkers ordered by charterers. (See attached email from Mr. Mortensen dated June 17, 2003, Exhibit "B"). Mr. N. Vasudevan of PSL wrote to Mr. Mortensen on 18 June 2003 noting the no lien clause in the charter party and denying responsibility for payment of the bunkers in question. (See attached email from Mr. Vasudevan, Exhibit "C"). Following this incident, PSL stopped doing business with O.W. Bunker when purchasing bunkers for its own account.

In 2005, O.W. Bunker requested that PSL reconsider its refusal to do business with O.W. Bunker. On June 14, 2005, PSL wrote an e-mail to O.W. Bunker Far East Pte Ltd., stating:

> Many thanks your email and the interest in reviving the business relations. Our company has agreed to reinstate O.W. BUNKERS as one of the bunker suppliers for PSL vessels *on the explicit understanding that O.W. Bunkers will not approach PSL and/or arrest or cause to be arrested any vessel owned/operated by PSL for claims relating to bunkers supplied to PSL vessels on orders placed by the said vessels' time-charterers and/or anyone other than PSL*. (emphasis added). (Exhibit "D")

O.W. Bunker Far East specifically confirmed their agreement to this:

> I hereby confirm your wording as per below and we hereby acknowledge that this will be the basis for any business transaction between the parties. (Exhibit "E")

Despite this clear agreement, ING commenced this action against a PSL-controlled vessel for bunkers ordered by a time charterer (Copenship).

ING should be prohibited from demanding payment from a PSL-controlled entity for an obligation created by the Vessel's charterer. Such a scenario is exactly the kind of risk that PSL wanted to avoid when it ceased doing business with O.W. Bunker and

7

what it wished to be protected from when it conditioned renewing business with O.W. Bunker on the latter's promise to not seek arrest of PSL-controlled vessels for bunkers ordered by anyone other than PSL. On the basis of that understanding, PSL changed its position and resumed doing business with the O.W. Bunker group to its detriment considering the arrest of the Vessel and all the costs it has incurred to date in the process of defending against the present lawsuit.

O.W. Bunker may try to renege on its agreement by arguing that it was made by only one particular O.W. Bunker entity, i.e. O.W. Bunker Far East. The agreement by PSL (Exhibit "B") referred to O.W. Bunkers not any specific O.W. Bunker subsidiary or affiliate. PSL specifically asked for confirmation of "understanding and agreement," and O.W. Bunker confirmed the wording and agreement without any reservation that it applied only to O.W. Bunker Far East. Moreover, in 2003 when O.W. Bunker pushed for payment of bunkers delivered to the PSL-associated vessel APISARE NAREE, demand letters were sent by Claus E. Mortensen of OWB Group Worldwide. (Exhibit "F") O.W. Bunker cannot be allowed to act as one entity when that suits it purposes, and separate entities when that is to their advantage.

Further, ING itself indirectly recognizes the single business operation of O.W. Bunker group when it claims to be the assignee of the group's claims even though in most cases the agreements with the different physical suppliers concerned entities within the O.W. Bunker group, such as O.W Bunker Far East or O.W. Bunker Spain.

Assuming ING is the assignee of O.W. Bunker, which is specifically denied, it should be precluded from bringing the present action in violation of the clear agreement

between O.W. Bunker group and PSL that claims such as this one were waived by O.W. Bunker in exchange for PSL's business.

**3.      U.S. law, including U.S. maritime lien law, does not apply to this case.**

There is no basis for United States law to apply to this transaction involving the supply of bunkers in Gibraltar to a non-U.S. flag vessel chartered by a non-U.S. entity from a non-U.S. vessel owner.  Plaintiff ING makes no argument that United States law applies of its own force.  Instead, ING refers to the contract between O.W. Bunker and Copenship to invoke a maritime lien.  (Complaint, ¶¶ 13-15.)  That may possibly be sufficient to invoke United States law in a claim against Copenship, but it is not sufficient to validly apply U.S. law to a non-party to the agreement.

Maritime liens for necessaries arise solely by operation of law and cannot be granted via contracts between the parties. (See *Gulf Coast Trading & Transp. O. v. Vessel Hoegh Shield,* 658 F.2d 363, 366, 1982 AMC 1139, 1144 (5th Cir. 1981) (noting a distinction between a sales contract between a bunker supplier and charterer and the application of a maritime lien in favor of a supplier).

Courts and academics alike have clearly and convincingly reasoned that choice-of-law provisions should not be dispositive in determining availability of a maritime lien. Courts should employ a traditional choice-of-law analysis inquiring whether there are sufficient connections between a claim and the United States to justify making the remedy of a U.S. Maritime lien available to the claimant. See, e.g., Martin Davies, *Choice of Law and U.S. Maritime Liens,* 83 Tul. L. Rev. 1435, 1446 (2009) (advocating for courts to complete a separate choice-of-law analysis); Mark S. Davis & Jonathan T. Tan, *To Port or Starboard? Why the Supreme Court Might Provide Direction to Those Navigating Choice-of-law Questions in Maritime-Lien cases: The 2015 Nicholas J. Healy*

*Lecture,* 46 J. Mar. L. & Com. 395, 418, 458 (2015) (noting the "lack of clarity in the majority approach to the maritime-lien-choice-of-law issue, about the weight that should be given to a choice-of-law clause"); Chelsea Crews, *The Liening Tower of Precedent: The Fifth Circuit Further Fractures Consensus on Choice-of-Law Clauses Governing Maritime Lien in World Fuel Services Singapore Pte, Ltd. v. Bulk Juliana M/V*, 41 Tul. Mar. L.J. 585 (2016-2017) (noting that giving automatic deference to contractual choice-of-law provisions "could require courts to hear an immeasurable number of maritime lien cases with virtually no connection to the United States other than the parties' selection of U.S. law"); *Rainbow Line Inc. v. M/V Tequila,* 480 F. 2d 1024, 1026, 1973 AMC 1431, 1433 (2d. Cir. 1973) (relying on the multi-factor choice-of-law analysis in *Lauritzen v. Larsen*, 345 U.S. 571, 1953 AMC 1210 (1953)); *O.W. Bunker Malta Ltd. v. M/V TROGIR*, 602 F. Appx. 673, 677 (9th Cir. 2015) (Watford J. concurring); *Neftehim Bunker, J.S.C. v. Ridgebury Nicholas MV*, 2017 AMC 84 (E.D.La. 2016). The opposite approach[8] which seems to be that contractual choice-of-law provisions essentially displace the need to perform a traditional choice-of-law analysis (See, Crews *supra* at 588) has the inequitable and intolerable result that parties may adversely affect the rights of third parties, including mortgagees and other lien claimants against the ship in question.

Further, academics who convincingly argue against the idea that parties can attempt to contractually apply United States maritime lien law also point out that that it is a well-established proposition that U.S. law should apply only within the territorial jurisdiction of the United States to protect against conflicts with the laws of other nations

---

[8] See *World Fuel Servs. Sing, Pte, Ltd. v. Bulk Juliana M/V,* 822 F.3d 766, 768-69, 2016 AMC 2723, 2724-26 (5th Cir. 2016), *petition for cert. denied* 137 S. Ct. 2290 ( U.S. June 26, 2017) (No. 16-26).

which could result in "international discord." [9] (See *Equal Emp't Opportunity Comm'n v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991). That is especially concerning in the surveyed cases involving maritime liens. (See Davis *supra* at 273-5).

As already mentioned, here, PVL was not a party to the bunker supply contract between O.W. Bunker and Copenship and did not agree to the application of United States law. The mere fortuity of the vessel traveling to a United States port nearly two years after the bunkers were supplied in another country should not result in the application of U.S. maritime lien law to this claim.

**4.      Even if U.S. maritime lien law applies, the lien here was lost due to laches.**

The bunkers in question were provided in October 2014. (See Exhibit A to ING's Verified Complaint, R. Doc. 1). Payment was due in November 2014. (See O.W. Bunker's Invoice attached as Exhibit D to ING's Verified Complaint, R. Doc. 1). The company ordering the bunkers, Copenship, declared bankruptcy in February 2015. However, ING/O.W. Bunker delayed until July 2016 before seeking to arrest the vessel. Had ING taken more timely action, PVL would have been in a better position to exercise its rights against the charterer, instead of being in line in the bankruptcy proceedings along with every other creditor of Copenship, uncertain if it would actually collect any of the money paid to ING/O.W. Bunker.

Laches is an equitable doctrine which, if proved, is a complete defense to a claim. Laches arises when there has been a delay in asserting a maritime claim subjecting the defendant to a disadvantage in asserting or establishing a defense to the

---

[9] Martin Davies, *Maritime Liens and Choice of Law : 27th Biennial Admiralty Law Institute of Tulane University,* 42 TUL. MAR. L. J. 269 (2017-2017)

claim. *Union Pac. R.R. Co. v. Dunham Price Marine*, LLC, 2008 W.L. 3539726, at *2 (W.D.La. Aug. 13, 2008, internal citations omitted).

*Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 2016 U.S. Dist. LEXIS 51568 (S.D.N.Y. Apr. 6, 2016) shares analogous facts with this case. There, the United States District Court for the Southern District of New York dismissed a maritime lien claim asserted by the bunker supplier due to laches. Bunkers were ordered on August 23, 2011 by the charterer. Like here, several months later, on November 6, 2012, the charterer was declared bankrupt by a court in Greece. The supplier of bunkers made no attempt to arrest the vessel prior to the charterer's bankruptcy, and the court found inexcusable delay by the supplier of the bunkers and held that it was barred from enforcing the maritime lien by laches.

ING made no effort to arrest the Vessel or even put her owner on notice of the outstanding amount that was due by the charterer until almost two years after the amount for the bunkers supplied to the Vessel became due. Most critically, ING made no effort to arrest the Vessel or put her owner on notice <u>before</u> the charterer declared bankruptcy, several months after O.W.'s bill became due.

Had PVL known that there was an outstanding bill for bunker supplies and that her Vessel was under a threat to be arrested, it would have endeavored to exercise all of its rights under the charter party agreement with Copenship at the time of the Vessel's delivery back to PVL in December 2014 when the charter party agreement expired. Bringing a claim in bankruptcy, like PVL did here, where there are no warranties as to recovery is on its own terms prejudicial. ING's delay in bringing the present action was inexcusable and prejudicial to PVL. As such, to the extent it is found

that ING has a maritime lien, which is specifically denied, it should be barred under laches.

**5. Even if, which is denied, plaintiff has a right to pursue a U.S. maritime lien, the lien does not extend to attorneys' fees or interest.**

In addition to seeking the invoice amount for the bunkers totaling $206,735.32, plaintiff also seeks contractual interest at the exorbitant amount of 3% per month, administrative fees, and $50,000 for accrued and anticipated attorneys' fees. This is all based on provisions in the contract between O. W. Bunker and Copenship. The vessel was not a party to this contract and the law is clear that contractual interest and contractual attorneys' fees cannot be claimed under a maritime lien.

In *Gulf Marine & Indus. Supplies, Inc. v. Golden Prince M/V*, 230 F.3d 178, 2001 AMC 817 (5th Cir. 2000), the Fifth Circuit held that while the list of necessaries enumerated at 46 U.S.C.S. § 31301 of the Federal Maritime Law Act ("FMLA") —which was later re-codified to the Commercial Instruments and Maritime Liens Act ("CIMLA")— is not exhaustive, "legal services do not fit naturally into this list of traditional shore-to-ship goods and services." The Court went on to note that "[s]ince Congress enacted the FMLA, courts have consistently held that legal services are not necessaries" and that these fees to collect a debt for necessaries did not help the Vessel function. (*Gulf Marine,* 230 F.3d 180-81). See also *Triton Marine Fuels, Ltd. v. M/V Pac.* Chukotka, 671 F. Supp. 2d 753 at *761 (D. Md. 2009) *citing* James *Creek Marina v. Vessel My Girls,* 964 F. Supp. 20, 23 (D.D.C. 1997) (determining security to be posted to release an arrested vessel, and holding that attorney's fees – incurred by creditor trying to collect debt for necessaries—were not necessaries).

As to pre-judgment interest, PVL concedes that to the extent that ING has a maritime lien under CIMLA —which is specifically denied— that lien covers some pre-judgment interest. "However, a maritime lien for necessaries does not necessarily govern the *contractual* pre-judgment interest rate." (*Triton Marine Fuels,* 671 F. Supp. 2d at 764 quoting among other cases *Gulf Marine & Indus. Supplies,* 1999 U.S. Dist. LEXIS 11500, 1999 WL at *4 (emphasis added); *Galveston Yacht Serv. Inc. v. Yacht Patricia*, 1984 AMC 1719, 1981 WL 463 *2 (S.D. Tex. 1981) (dicta) ("Even where parties in this action have entered into a contract expressly providing for interest on amounts due thereunder, it is doubtful whether the maritime lien [for providing necessaries under the FMLA] asserted would encompass a claim for such interest.").

As such it is clear that ING is not entitled to any attorney fees, administrative costs, or the usurious interest rate specified in the contract between O.W. Bunker and Copenship.

III. **CONCLUSION**

It is undisputed that: (1) O.W. Bunker's assignment of a maritime lien to ING is ineffective under English law because a maritime lien is not transferrable; (2) O.W. Bunker has specifically agreed to waive claims such as this in exchange for renewing business with PVL; (3) there is no connection between the U.S. forum and this dispute and U.S. maritime law should not apply; (4) to the extent that ING has a maritime lien it is barred by laches; and, (5) ING is not entitled to legal fees, administrative costs, and excessive contractual pre-judgment interest of 3% per month.

For these reasons, PVL urges the Court to grant the relief it seeks.

Respectfully submitted,

**PHELPS DUNBAR LLP**

BY:   *s/Kevin J. LaVie*
      Kevin J. LaVie (#14125)
      Magdalini Galitou (#38473)
      365 Canal Street – Suite 2000
      New Orleans, Louisiana 70130-6534
      Telephone: (504) 566-1311
      Telecopier: (504) 568-9130
      kevin.lavie@phelps.com
      magdalini.galitou@phelps.com

      ATTORNEYS FOR DEFENDANT,
      PRECIOUS VENTURES LIMITED