IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| ING BANK N.V., | * | |
|     Plaintiff, | * | |
| v. | | |
| | * | Civil Action No. 2:16-cv-01003 |
| M/V CHARANA NAREE, IMO No. 9296303, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem* | * | JUDGE CAIN |
| | * | MAGISTRATE JUDGE KAY |
|     Defendant *in rem*, | * | |
|   *    *    *    *    * | * | |
| MACOIL INTERNATIONAL S.A., | * | |
|     Intervening Plaintiff, | * | **IN ADMIRALTY** |
| v. | | |
| | * | |
| M/V CHARANA NAREE, IMO No. 9296303, her engines, tackle, equipment, furniture, appurtenances, etc., *in rem* | * | |
|     Defendant *in rem*, | * | |
| and | * | |
| ING BANK N.V. | * | |
|     Cross-Defendant *in personam*. | * | |
|   *  *  *  *  *  *  *  *  *  *  *  * | | |

**MACOIL MEMORANDUM SUPPORTING
<u>SUMMARY JUDGMENT</u>**

There is no material fact dispute that:

- No one has ever paid Macoil for the USD 200,488.71 of bunkers Macoil provided the M/V CHARANA NAREE ("Vessel");

- Macoil retained title to the bunkers; and

- Egyptian law, through which Macoil has the right to arrest the Vessel, controls Macoil's provision of the bunkers to the Vessel.

This Court now should grant Macoil summary judgment as a matter of law, for the USD 200,488.71 of bunkers Macoil provided to the Vessel, maritime prejudgment interest and costs..

Macoil invoiced the value of its bunkers, **$200,488.71** - to the Master and Owners of the Vessel, and OW (Macoil Invoice, **Exhibit A** hereto). Macoil's invoice confirms Macoil's insistence that:

> The sale and delivery of the petroleum products described above is subject to the Terms & Conditions contained on the reverse side of this invoice.
>
> The acceptance of the petroleum products by Vessel named above shall be deemed to constitute acceptance and approval of said Terms & Conditions

Macoil provided its bunkers to the Vessel pursuant to Macoil's sales terms and conditions (**Exhibit B** hereto) stating in pertinent part:

> **PAYMENT**
>
> Unless otherwise agreed, payment for each delivery shall be made without discount in United States Dollars to Seller at its above address at the latest within thirty (30) days from the date of each delivery or within seven (7) days of the date of Seller's invoice showing the quantity delivered and the amount due including charges. Each delivery shall be deemed to constitute a separate contract. Sales are on the credit of receiving vessels as well as on the Buyer's promise to pay, and amounts due shall be liens against such vessels.
>
> \* \* \*
>
> The delivery of marine fuel oil hereunder to any vessel shall create a valid maritime lien in favor of Seller or its Supplier. **"The Romalpa clause to apply".** (Until full payment of full amount is effected, it is agreed that the Buyer is in possession of the bunkers solely as bailee for the Seller) **This agreement, its performance and enforcement (inclusive of maritime liens arising hereunder) shall be governed and determined by the maritime law of Egypt**.

(Emphasis added).

First, the *Romalpa* clause refers to 1976 judgment of the Court of Appeal of England and

Wales in *Aluminium Industrie Vaassen BV v Romalpa Aluminium Ltd* [1976] 1 WLR 676, which recognizes that sellers may ( as Macoil did here) retain title until they are paid for the goods (bunkers are goods) they sell. Macoil's sales terms specify that "Until full payment of full amount is effected, it is agreed that the Buyer is in possession of the bunkers **solely as bailee for the Seller**." (Emphasis added).

Macoil retained, and continues to retain, title to its bunkers. Neither ING nor any OW entity has any right to a "lien" for the bunkers, much less any payment for them, over Macoil's title rights to the bunkers; all as "buyers" were bailees of the bunkers and their proceeds. This Court should grant Macoil summary judgment for this first reason: the bunkers and their proceeds, always belonged and belong to Macoil. ING could take no assignment of something OW never owned in the first place. The Vessel owners (or ING, if this Court determines that the Vessel must pay ING) must pay Macoil for the bunkers.

Second, Egyptian Maritime and Trade Law No. 8/1990, Article 60(m) provides a maritime lien in favor of MACOIL – as supplier of the bunkers - for "Supplies of materials or tools necessary for operating the ship or its maintenance, whatever the source of supplies being obtained." (Egyptian law Opinions, by Eldib Advocates, and Nabil Farag Law Firm, Egypt, **Exhibit C hereto**). Egyptian law controls the Macoil's provision of bunkers to the Vessel, *see World Fuel Servs. Sing. PTE, Ltd. v. Bulk Juliana M/V*, 822 F.3d 766 (5th Cir. 2016)(applying choice of law analysis to determine maritime lien rights); *Loginter S.A. v. M/V Nobility*, 177 F. Supp. 2d 411, 421 (D. Md. 2001)(recognizing maritime lien rights under Polish law), and as Egypt Law expert Abdel Hamid Fahmy, of Eldib Advocates (his opinion in **Exhibit C hereto** ) therefore concludes:

It is therefore my opinion that, under Egyptian law, Macoil holds a valid and enforceable maritime claim against the Vessel and that Macoil may enforce its maritime claim by instituting a conservatory arrest against the Vessel arising out of Macoil's provision of bunkers to the Vessel.

It is important to note that applying Egyptian law, no direct contract is required between the Vessel owner or charterer and Macoil, as U.S. maritime law requires. Macoil as physical supplier[1] loaded the bunkers on the Vessel, and therefore under Egyptian law may (and did, in intervention) arrest the Vessel to properly assert its claims to the bunkers, and payment.

It is also important to note that the bunkers provision to the Vessel - by Macoil - was in Gibraltar - ordered by owners (Thailand) through OW Denmark and then OW Spain under OW's controlling sales terms and conditions.[2] OW's sales term "L.4" incorporated Macoil's - and so for Macoil's $200,488.71 principal bunkers provision to the Vessel - as the Fifth Circuit explains in *BULK JULIANA*, Egypt law controls. The OW sales terms (clause "L.4") that ING insists control, incorporate Macoil's sales terms:

> These Terms and Conditions are subject to variation in circumstances **where the physical supply of the Bunkers is being undertaken by a third party** [herein Macoil] which insists that the Buyer [which OW's terms also defines as the Vessel's Owners/Charterers] is also bound by its own terms and conditions. In such circumstances, **these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party**.

OW's own sales terms - which expressly incorporate the third party physical supplier's: Macoil's (which OW's invoice identifies as, "supplier.") What is incorporated, through the OW

---

[1] Macoil paid Vemaoil to physically supply the bunkers to the Vessel at Gibraltar, subject to Macoil's sales terms and conditions. Vemaoil, Gibraltar, was Macoil's agent for provision of the bunkers; for the bunkers provision, Vemaoil (Macoil's agent) is Macoil.

[2] The Mortensen affidavit, to ING's summary judgment memorandum, ECF 73-1, Exhibit B, sets out the OW terms and conditions, which ING's complaint also attaches.

Clause L.4 carried throughout the OW Terms applying to OW Spain and Denmark, is (a) Macoil's maritime arrest right; (b) Egyptian law (including its *in rem* maritime lien for Macoil's $200,488.71 bunkers supply); and ( c) Macoil's retention of title to the bunkers.

The OW terms and conditions apply through for **all** OW entities - not just the OW Denmark entity, but OW Spain from which OW Denmark supposedly bought.  The consistent "OW Group" terms ( which ING exhibits to its complaint) carry through - by OW clause "L.4" physical supplier terms - and also **expressly reserve the passage of title** to the bunkers.[3] Macoil's sales terms, set out above, also expressly reserve title passage until payment for Macoil's bunkers: "Until full payment of full amount is effected, it is agreed that the Buyer is in possession of the bunkers solely as bailee for the Seller."

Third, OW's sales confirmation, exhibited to the ING complaint, **expressly identifies Macoil as "Supplier"** with the bunkers provided to the "account of" "MASTER AND/OR OWNER AND/OR CHARTERERS AND/OR MV CHARANA NAREE" and charterer Copenship (now, out of business).  A significant factor in the Court awarding judgment for the

---

[3]  OW's terms – also exhibited to the ING Complaint, provide as follows:

H. TITLE
H.1 Title in and to the Bunkers delivered and/or property rights in and to such Bunkers shall remain vested in the Seller until full payment has been received by the Seller of all amounts due in connection with the respective delivery. The provisions in this section are without prejudice to such other rights as the Seller may have under the laws of the governing jurisdiction against the Buyer or the Vessel in the event of nonpayment.

H.2 Until full payment of the full amount due to the Seller has been made and subject to Article G.14 hereof, the Buyer agreed that it is in possession of the Bunkers solely as Bailee for the Seller, and shall not be entitled to use the Bunkers other than for the propulsion of the Vessel, nor mix, blend, sell, encumber, pledge, alienate, or surrender the Bunkers to any third party or other Vessel.

physical supplier in *Martin Energy Servs., LLC v. M/V Bourbon Petrel*, 2018 U.S. Dist. LEXIS 198285 (E.D. L.A. Nov. 20, 2018)(Fallon, J.) was that the bunker transaction identified the physical supplier, confirming, the physical supplier's right to be paid.   Accord, *Martin Energy Servs., LLC v. M/V Bravante IX*, 733 Fed. Appx. 503 ( 2018), *affirming Martin Energy Servs., LLC v. M/V Bravante IX*, 233 F. Supp. 3d 1269 (N.D. Fla., Jan. 26, 2017)(fuel supplier's subcontractor, could recover in *quantum meruit* from the owner for the value of the fuel that it delivered and provided).

The bunkers - for which ING claims - **never belonged to any OW entity** - as OW's own terms further confirm.   Because the bunkers never belonged to OW - ING has **no** claim to any amount in payment for them (other than, perhaps, for OW's (ING's) $6,246.61 mark up/commission).

This case is distinct from other U.S. cases involving competing claims between physical suppliers and ING Bank N.V. (as the alleged assignee of various OW entities).   While the other U.S. cases involve competing claims to a single source of funds arising under the Commercial Instruments and Maritime Lien Act ("CIMLA"), *this* case does not.   Macoil's claim is based on Egyptian – not U.S. – law, and the CIMLA therefore has no application here with respect to Macoil's claim.

/

/

This Court now should grant Macoil summary judgment, including prejudgment interest[4] and costs.

Dated: January 28, 2020.

> Respectfully Submitted,
>
> /s/ J. Stephen Simms
> J. Stephen Simms
> Simms Showers LLP
> 201 International Circle
> Baltimore, Maryland 21030
> 410-783-5795
> jssimms@simmsshowers.com
>
> Macoil Counsel

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 28, 2020 caused the foregoing to be filed on this Court's CM/ECF system for service on all record counsel.

> /s/ J. Stephen Simms

---

[4] "As a general rule, prejudgment interest should be awarded in admiralty cases -- not as a penalty, but as compensation for the use of funds to which the claimant was rightfully entitled." *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980).