# SHIP ARREST IN EGYPT

By Nabil Farag*
NABIL FARAG LAW FIRM
nbllaw@interlink.com.eg
www.nbllaw.com
23, July & Abou El-Feda St., El – Shark
Second Floor, El-Shammaa Tower, 42111
P.O. Box: 1036. Port Said. Egypt
Tel: +20 66 320 8888 / +20 66 3208963
Fax: +20 66 3208806 / +20 66 3208255



1. Please give an overview of ship arrest practice in your country.

To proceed with an arrest order against an owing vessel in Egypt, in accordance with the Egyptian Maritime Trade Law No 8/1990, Article No 60, it's required to prepare some steps such as filling an arrest application (an arrest petition) to the competent court by their jurisdiction, this petition must explain the matter. A brief of the relation between the claimant and defendant, and the nature of debit which must be one of the debits indicated in the Article No 60, of the Egyptian Maritime Trade Law No 8/1990. The required documents relating to these debits in order to arrest a vessel as indicated in clause no (1) must be presented and attached to a certified translation into Arabic for all documents, for example (In case the arrest application was relating to outstanding invoices for insurance instalments issued by a marine insurance policy, all outstanding invoices, Insurance Policy and other documents such as mutual correspondents, faxes, e-mails and other agreements which prove this debits should be presented).
A legalized power of attorney must be granted by the client (The claimant) who is filing an arrest application. This power of attorney must be signed by the client, certified by the Apostille then legalized by the Ministry of Foreign Affairs and by the Egyptian consulate in the client's country. This power of attorney must be translated into Arabic by the Ministry of Justice in Egypt.

2. Which International Convention applies to arrest of ships in your country?

The 1952 Brussels' Convention of the ship arrest is applied on the ship arrest in Egypt.

3. Is there any other way to arrest a ship in your jurisdiction?

The first applicable law for the arrest procedures is the Egyptian Maritime and Trade Law No 8/1990. In addition to the Egyptian Commercial law and the Egyptian substantiation law, there are some other applicable laws can be applied on the ship arrest in Egypt such as the Egyptian administrative law which allows the governmental authorities and public establishments to arrest a ship if it has been owed to them as example for a port dues or any other governmental debits, Then the governmental authority or the public establishment has the legal right to arrest the vessel directly by their order and without getting an arrest order form the judge.

4. Are these alternatives e.g. saisie conservator or freezing order?

No, these alternatives do not saisie conservator or freezing the ship arrest order but both procedures are compatible with them.

5. For which types of claims can you arrest a ship?

The legal recognizing liens in Egypt as indicated in the Egyptian Maritime and Trade Law No 8/1990, the Article No 60, as follows:
      (a) Port and water courses duties.
      (b) Expenses outlaid for removal, pick up, or lifting the wrecks and merchandise.
      (c) Damages caused by the ship by cause of collision, pollution or other similar marine incidents.
      (d) Casualties of lives or bodily injuries caused by the ship, as a result of using and exploiting it.
      (e) Contracts and deeds for using or renting the ship.
      (f) Insurance on the ship.
      (g) Contracts for transport of goods by virtue of a rental contract or bill of lading.
      (h) Destruction of goods and luggage transported by the ship, or their damages.
      (i) Salvage and rescue works.
      (j) Joint losses.
      (k) Tugging the ship.
      (l) Piloting works.



(m) Supplies of materials or tools necessary for operating the ship or its maintenance, whatever the source of supplies being obtained.
(n) Ship-building, repairing or furnishing the ship, and expenses incurred for the ship in dry-docks and dockyards.
(o) Incurred salaries and wages for captain, ship-officers and the crewmembers by the shipping agencies.
(p) Incurred money by the captains, Ship-forwarders, Ship-Charterers, or shipping agencies for the account of ship or ship-owners.
(q) Disputes about the ownership of ship.
(r) Disputes about the common ownership of ship, or about holding or exploiting and operating it, or the rights of ship-owners in common to the amounts resulting from using and exploiting the ship.
(s) Marine mortgage.

6. Can you arrest a ship irrespectively of her flag?

The arrest procedures are applicable irrespective of the flag of the ship whatsoever, also irrespective of the claimant or debtor's residency.

7. Can you arrest a ship irrespectively of the debtor?

The arrest procedures are applicable irrespective of the Debtor's residency or nationality.

8. What is the position as regards sister ships and ships in associated ownership?

The procedures are also applicable on the sister-ship and a ship associated with the same ship-owners. The sister ship of the owing vessel is allowed to be arrested in Egypt in accordance with the Egyptian Maritime and Trade Law No 8/1990, Article No 61, which allows the claimant to arrest the sister ship through the same procedural requirements as mentioned above. The referred Article No 61 stated that:
"Whoever holds any of the debits specified in the previous article, can levy an arrest on the ship with which the debit is connected or any other ship owned by the debtor if such ship was in his possession at the time of instituting the debit". However, no attachment may be levied on another ship than the one to which the debit is related if the debit is one of those prescribed in items Q, R and S of the previous article".
These referred items as indicated in the article No 60 are as follows:
(q) Disputes about the ownership of vessel.
(r) Disputes about the common ownership of vessel or about holding or exploiting and operating it, or the rights of ship-owners in common to the amounts resulting from operating and exploiting the ship.
(s) Marine mortgage.

9. What is the position as regards Bareboat and Time-Chartered vessels?

These arrest procedures are also applicable for the bareboat charters, Yachts, Fishing boats, Submarines and time-chartered or Voyage chartered vessels as explained.

10. Do your Courts require counter-security in order to arrest a ship?

A counter security is not required under the new Egyptian Maritime and Trade Law No 8/1990.

11. Is there any difference in respect to arresting a ship for a maritime claim and a maritime lien?

There is no difference between the maritime claim and the maritime lien in respect to arresting a ship which is subjected to the same procedures.

12. Does your country recognise maritime liens? Under which International Convention, if any?

The maritime liens are recognized by the Egyptian Maritime and Trade Law No 8/1990, also, the
1952 Brussels' Convention of the ship arrest is applied on the ship arrest in Egypt.

13. What lapse of time is required in order to arrest a ship since the moment the file arrives to your law firm?

The required time to arrest a ship starting from the moment of the referred documents arrival to our law firm is 24 hours.

### 14. Do you need to provide a POA or any other documents of the claim to the Court?

A legalized power of attorney must be granted by the client (the claimant) who fills the arrest application. This power of attorney must be signed by the client and certified by the Apostil or the local authentication office then legalized by the Ministry of Foreign Affairs and by the Egyptian consulate in the client's country. This power of attorney must be translated into Arabic by the Ministry of Justice in Egypt which takes from three to five days to be finished.

### 15. What original documents are required, what documents can be filed electronically, what documents require notarisation and/or apostille, and when are they needed?

The required documents relating these debits as indicated above in clause no (1) must be attached with the arrest application in addition to a certified translation into Arabic for all documents (Our law firm usually advises clients to send the documents by e-mail first to start the translation process urgently in order to save time for preparing the arrest application in proper time), for example (In case the arrest application relating to outstanding invoices for insurance instalments issued by a marine insurance policy. We have to present all outstanding invoices, Insurance Policy. And other documents such as mutual correspondents, Faxes, E-mails and other agreements which prove this debit).

### 16. Will your Courts accept jurisdiction over the substantive claim once a vessel has been arrested?

The Egyptian courts accept jurisdiction over the substantive claim once the vessel has been arrested. Also all claims against the arrested vessel will be accepted in respect to the jurisdiction.

### 17. What is the procedure to release a ship from arrest?

In according to the Egyptian Maritime Trade Law No 8/1990, Article No 63, in order to release a ship from arrest, an application of release a ship from arrest must be submitted by the defendant to the chief of judge or his representative on his jurisdiction attached with a bail or guarantee letter to be sufficient for settlement of debit.

### 18. What type of security needs to be placed for the release?

In spite of the article No 63, of The Egyptian Maritime Trade Law No 8/1990, didn't explain definitely the required type of security of bail or guarantee letter however the practical practice is indicated that a bank guarantee letter must be submitted by a known bank to be acceptable. Also, a deposit of cash money equivalent to the total debit will be acceptable too.

### 19. Does security need to cover interest and costs?

The security must cover the interest and 10% for the costs in case of the judge was included to the capital debit in the arrest warrant.

### 20. Are P&I LOUs accepted as sufficient to lift the arrest?

As referred the practical actual is indicated that P&I LOUs are not acceptable at all.

### 21. How long does it take to release the ship?

It's usually takes about from one to two days to release a ship from arrest starting from the date of submitting the application of release the ship from arrest to the chief of judge.

### 22. Is there a procedure to contest the arrest?

The defendant has a right to contest against the arrest warrant before the summary execution court whether the arrest was executed or not yet. The defendant also has a right to consent against the plenary trade court through 10days starting from the date of commencement of execution of the arrest. So, the judge can cancel the arrest warrant or amend it, Article No 197, of the Egyptian procedural law.

### 23. Which period of time will be granted by the Courts for the claimants in order to take legal action on the merits?

The Egyptian Maritime and Trade law No 8/90 gives the claimant 8 days exactly to take the legal action on the merits starting from the day of arrest, or otherwise the arrest will be cancelled by law. The Egyptian courts usually take time approximately one year to issue her award in the legal action of merits.

## 24. Do the Courts of your country acknowledge wrongful arrest?

The claims for wrongful arrest are allowed and organized by the Egyptian Civil Law No 131/1948, article No 163, which indicated as follows:
"Every fault was caused damages to the others shall required the indemnity"
So, the wrongful arrest is protected by the Egyptian Civil Law, and if someone arrests a vessel by wrong or by false documents. The claimant will be claimed by the ship-owners, Charters or operators to pay them all damages incurred as a result of the wrongful arrest. These damages will be determined by the court which has all rights and free to assume the value of damages including fines, incurred port dues and all other incurred expenses caused by this wrongful arrest.

## 25. Do the Courts of your country acknowledge the piercing and lifting of the corporate veil?

As a basic rule, the shareholders of a company with limited liability are not personally liable for the obligations of the company, but, the Egyptian maritime and trade law is organizing this point on the basis that rules of the Egyptian trade law which is depend on the type of company, so, If the ship-owner's company was established as a "Joint stock company". So, the shareholders will not be personally responsible for any obligations at all, but, if the ship-owner's company was established as a "corporate company". So, the shareholders will be personally responsible for the obligations and then the piercing and lifting of the corporate veil will be applied.

## 26. Is it possible to have a ship sold pendente lite; if so how long does it take?

When a vessel has been arrested, so that the ship-owners can't sale it at all without the court permission unless the arrest is removed, and if the ship-owners was sold the vessel while it arrested so this sale contract is considered null and void.

*Our legal services and consultancies are presented to Ship-Owners, Charters, P&I Clubs, Marine Insurance & Reinsurance Companies, Ship Agents, Repairs, Suppliers, Building, Oil & Gas Companies, etc. Our legal services are included, Marine insurance and reinsurance claims, Charter parties liabilities, Bills of leading, Ship sale/Purchase contracts, Collision/Salvage and General damage liabilities, Oil pollution/ Casualties, Stowaways and Refuges, Cargo liabilities (Shortage/Loose/Damage and Delay of cargo, Ship's Arrest/Release, in all Egyptian ports, Crew detention, Costs and Fines, Disputes settlements, Legal defence, disputes before the all Egyptian courts, Disputes under voyage/time charters, Financial collapse, Bankruptcy, Collisions of ships, Salvage claims and marine casualties, Marine mortgages, Crew wages claims, Personal injury and death claims, Ship registration, Ship deletion, Ship delays, Custom's fines and demurrages, Customs clearance facilities, Assisting in import & export procedures, All aspects of shipping, marine and trade disputes, International Arbitration, Execution of international judicial and arbitration awards in Egypt.



**A t t o r n e y s   A t   L a w**

# Legal opinion.

Dear Sirs,

We had been asked by Mr. Marios J. Monopolis of Simms Showers LLP, USA, to provide our legal opinion on Egyptian maritime law, and specifically, whether a maritime lien arising under Egyptian Maritime and Trade Law No 8/1990 is a lien <u>in rem</u> (i.e. it follows the vessel) and not simply a lien (i.e. a simple right of arrest). The question was exactly as follows;

Our client is a bunker supplier whose terms and conditions are governed by Egyptian law.  Our client supplied bunkers to a vessel through a multi-party transaction involving O.W. Bunker Spain.  The vessel has subsequently been arrested in the United States and our client, along with ING Bank (the purported assignee of O.W. Bunker Spain's receivables), is among the arresting parties.  One of the critical questions that will certainly arise is whether our client holds a maritime lien in rem against the vessel pursuant to its Egyptian law-governed terms and conditions.

So, this is our legal opinion about for these questions;

The Egyptian Maritime Trade Law No 8/1990, Article No 60, is stated that:

It's prohibited to levy an attachment on the ship except to remedy the maritime debit, And the debit is considered as a maritime debit if it was raised upon the next reasons;

A – Port and water courses duties.
B – Expenses outlaid for removal, pick up, or lifting the ship wrecks and merchandise.
C- Damages caused by the ship by cause of collision, pollution or other similar marine incidents.
D – Casualties in lives or bodily injuries caused by the ship, as a result of using and exploiting it.
E – Contracts and deeds for using or renting the ship.
F- Insurance on the ship.
G – Contracts for transport of goods by virtue of a rental contract or bill of lading.
H – The destruction of goods and luggage as transported by the ship, or their damage.
I – salvage and rescue works.
J – Joint losses.
K – Tugging the ship.
L – Piloting works.
M – Supply of materials or articles necessary for using the ship or its maintenance, whatever the source such supplies are being obtained.

Head Office/ 23,July & Abou El-feda St., Second Floor,  El-Shamaa Tower,  El-Shark district .   P.O.   Box: 1036.   Port Said,   Egypt.
Tel: +20 66 320 8888. Fax: +20 66 33 55 061. E-mail: nbllaw@interlink.com.eg – nabilfaraglaw@gmail.com Web Sites: www.nbllaw.com.



N – Building, repairing or furnishing the ship, and expenses of the ship's presence in dockyards.
O – Salaries and wages of captains, officers, the crew and the maritime and shipping agencies.
P – Amounts expended by the captains, forwarders, renters, or maritime and shipping agencies for account of the ship or its owner.
Q – Disputes over the ship's ownership.
R – Disputes over the common ownership of the ship, or over holding or exploiting and using it, or the rights of ship – owners in common to the amounts resulting from using and exploiting the ship.
S – Marine mortgage.

So, the item M of the article No 60/1990 was stated that defined that the bunker supply is considered a maritime debit which allow the debtor to levy an attachment on the vessel who ordered the bunkers.

Also the article No 61/1990 was stated that:

"Whoever, any one of the debtors specified in the previous article (60/1990) to levy an attachment on the ship which the debt is connected or any other ship to be owned by the debtor if the latter ship was in his possession at the time of instituting the debt"
"However, no attachment may be levied on another ship than the one to which the debt is related if the debt is one of those prescribed in items Q, R and S of the previous article".
These referred items as indicated in the article No 60 are the followings:
Q – Disputes over the ship's ownership.
R – Disputes over the common ownership of the ship, or over holding or exploiting and using it, or the rights of ship-owners in common to the amounts resulting from using and exploiting the ship.
S – Marine mortgage.

That's mean that if the owners were ordered the bunkers to the ship, So, the bunker supply company have a write to levy an attachment against this ship itself, and if the charterers were ordered the bunkers to the ship while the ship was directed by them, So, the bunker supply company have a write to levy an attachment against this ship itself, That's mean that the main consideration is who was ordered the bunkers itself.

Best regards.

**Nabil Farag.**

**Nabil Farag Law Firm, Egypt.**

# DECLARATION OF ABDEL HAMID FAHMY

I, Abdel Hamid Fahmy, of Eldib Advocates, declare that:

1. I am a practicing international maritime lawyer, a partner of Eldib Advocates, and a member of the Egyptian bar association. I am admitted to practice law in the courts of appeal in Egypt.

2. I specialize in a number of areas of law, including admiralty and maritime law.

3. I have been asked to provide an opinion on Egyptian law in these proceedings in connection with the claims of Macoil International S.A. ("Macoil") to a maritime lien and/or a maritime right to arrest arising out of its provision of bunkers to the M/V CHARANA NAREE (the "Vessel"). I understand that ING Bank N.V. ("ING") also claims a maritime lien against the Vessel as the alleged assignee of O.W. Bunker & Trading A/S ("OWB"). OWB purportedly contracted with the Vessel's charterer Copenship Bulkers A/S ("Copenship") through a subsidiary, O.W. Bunker Spain SL ("OWB Spain"), for the provision of the bunkers.

4. I understand that the facts giving rise to the dispute are generally outlined as follows:

    a. On or about October 28, 2014, Copenship (the charterer of the Vessel) placed an order with OWB for the provision of bunkers to the Vessel.

    b. OWB then contracted with OWB Spain, which then contracted with Macoil, for the same provision of bunkers to the Vessel.

    c. On or about October 29, 2014, Macoil physically supplied the bunkers to the Vessel at Gibraltar and the Vessel accepted those bunkers.

d. Subsequent to the physical supply of the bunkers, the Vessel's Chief Engineer signed Macoil's bunker delivery receipt acknowledging receipt of the bunkers.

e. On November 4, 2014, just days after the transaction outlined above, OWB filed for bankruptcy protection in Denmark. This was followed by the bankruptcy filings of numerous OWB subsidiaries around the world.

f. ING asserts a maritime lien as the purported assignee of OWB, which asserts a maritime lien against the Vessel pursuant to the OWB terms and conditions. The OWB terms and conditions are governed by English law, with the exception of maritime liens which are governed by United States law.

g. Macoil asserts a maritime lien as the physical supplier of the bunkers to the Vessel pursuant to Macoil's terms and conditions, which are governed by Egyptian law.

5. I have been provided with and reviewed the following documents in connection with the above-mentioned dispute:

a. The order confirmation from OWB Spain to Macoil.

b. Macoil's terms and conditions.

c. Macoil's intervening verified complaint.

6. I have been asked to provide my opinion on Egyptian maritime law in response to the following issue:

a. Whether, under the facts presented, a maritime claim giving rise to a right of arrest arises in favor of the physical supplier of necessaries under Egyptian law.

7. Article 1 of the Egyptian Maritime Law No. 8 of 1990 stipulates that "subject to any rules or provisions as provided in special laws (which include international treaties and conventions), the provisions of the maritime law No.8 of 1990 shall be applicable."

8. Egypt is a signatory to the International Convention Relating to the Arrest of Sea-Going Ships ("Brussels Convention 1952"), which is incorporated into Egyptian law pursuant to Egyptian Maritime Law No. 8. Egyptian Maritime Law No. 8 has predominantly adopted the same rules of arrest found in the Brussels Convention 1952 and is therefore applicable by its terms to maritime liens and maritime claims arising under Egyptian law.

9. Under Egyptian law, conservatory arrests are governed by *inter alia* Article 60 of Egyptian Maritime Law No. 8 which provides that a vessel may be arrested on the basis of a maritime debt, which arises from one or more of the following causes:

   A. Port and water courses duties.

   B. Expenses outlaid for removal, pick up, or lifting the ship wrecks and merchandise.

   C. Damages caused by the ship by cause of collision, pollution or other similar marine incidents.

   D. Casualties in lives or bodily injuries caused by the ship, as a result of using and exploiting it.

   E. Contracts and deeds for using or renting the ship.

F. Insurance on the ship.

G. Contracts for transport of goods by virtue of a rental contract or bill of lading.

H. The destruction of goods and luggage as transported by the ship, or their damage.

I. Salvage and rescue works.

J. Joint losses.

K. Tugging the ship.

L. Piloting works.

M. Supply of materials or articles necessary for using the ship or its maintenance, whatever the source such supplies are being obtained.

N. Building, repairing or furnishing the ship, and expenses of the ship's presence in dockyards.

O. Salaries and wages of captains, officers, the crew and the maritime and shipping agencies.

P. Amounts expended by the captains, forwarders, renters, or maritime and shipping agencies for account of the ship or its owner.

Q. Disputes over the ship's ownership.

R.  Disputes over the common ownership of the ship, or over holding or exploiting and using it, or the rights of ship – owners in common to the amounts resulting from using and exploiting the ship.

S.  Marine mortgage.

19. The maritime debt arising under Article 60 is a direct maritime claim against the Vessel.

20. Pursuant to Clause M of Article 60, bunkers supplied to a Vessel give rise to maritime debt under Egyptian law which entitles the supplier of those bunkers to arrest the vessel by means of conservatory arrest. Clause M creates a maritime debt – through which a supplier may arrest a vessel – simply from an entity's physical provision of bunkers to a vessel.

21. The Court of Cassation confirmed, in a similar matter (Cassation Case No. 1516 / 66 Jud), the legitimacy of the arrest imposed on a vessel arising from a bunker supply to a vessel in Italy and Hong Kong when the respondent had failed to pay the bunker price within 30 days from the date of delivery.

22. Article 61 of Egyptian Maritime Law No. 8 stipulates that whoever insists on his right for any of the debts specified in the previous Article (maritime debts) may arrest the vessel involved with the debt or any other vessel which may have been owned by the debtor at the time the debt has taken place.

23. Pursuant to the provisions of Article 61, the general rule is that the arrest is enforceable against the vessel involved with the maritime debt. However, the law confers to the

creditor the right to arrest any sister vessel on the condition that it would have been owned by the debtor at the time the debt has taken place.

24. Article 62 of Egyptian Maritime Law No. 8 stipulates that if the charterer assumes the navigational management of the vessel (demise charterer) and is exclusively responsible for a marine debt involving the ship , in such a case, the creditor will have the right to arrest this ship (or any other ship which is owned by the charterer). The arrest may not be placed against any other vessel owned by the ship owner by virtue of the marine debt.

25. Pursuant to Article 62, the creditor holding a marine debt may arrest a charterer's chartered vessel on the condition that the charterer assumes the navigational management of the vessel and is the responsible for the marine debt.

26. Unlike United States maritime law (the Commercial Instruments and Maritime Lien Act (46 U.S.C. § 31301 *et seq.*), Egyptian maritime law does not require that the person procuring the necessaries be specifically authorized to do so. Under Egyptian maritime law, a maritime claim arises in favor of a physical supplier simply through the provision of necessaries to a vessel and the vessel's acceptance of those necessaries.

27. It is my understanding that there is no dispute that Macoil physically supplied bunkers to the Vessel at Gibraltar and that the Vessel accepted the bunkers supplied by Macoil.

28. It is my understanding that Macoil physically supplied the bunkers in question pursuant to its terms and conditions, which are governed by and call for the application of Egyptian law.

29. It is therefore my opinion that, under Egyptian law, Macoil holds a valid and enforceable maritime claim against the Vessel and that Macoil may enforce its maritime claim by instituting a conservatory arrest against the Vessel arising out of Macoil's provision of bunkers to the Vessel.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 15th January, 2017.

_____
Abdel Hamid Fahmy
Eldib Advocates

Eldib Advocates