UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **ING BANK, N.V.** | **CASE NO. 2:16-CV-01003** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **M/V CHARANA NAREE** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court are Motions for Summary Judgment [docs. 71, 77] filed, respectively, by plaintiff ING Bank, N.V. ("ING") and intervenor plaintiff Macoil International, S.A. ("Macoil"). Both motions relate to the *in rem* claims that Macoil brings against the M/V Charana Naree for payment on fuel oil it supplied to that vessel, and both motions are opposed.

## I.
### BACKGROUND

This suit is one of several arising from the collapse of the O.W. Bunker Group, a global operation which supplied bunkers (fuel oil) to ships in international commerce. The present action relates to the M/V Charana Naree, a vessel sailing under the flag of Thailand, which is owned by foreign corporation Precious Ventures, Ltd. ("PVL") and was operated on a time charter by the Danish firm Copenship Bulkers A/S ("Copenship"). Doc. 76, att. 3, pp. 8–9; *see* doc. 33 (PVL corporate disclosure).

In October 2014, Copenship ordered bunkers from O.W. Bunker & Trading A/S ("OW Denmark") to refuel the vessel. The order was memorialized through a sales order

confirmation and, after a change to the volume of fuel requested, revised sales order confirmation issued by OW Denmark. *See* doc. 71, atts. 4 & 5 (sales order confirmations). Both orders provided that the transactions were governed by OW Bunker Group's "Terms and Conditions of [S]ale(s) for Marine Bunkers," at a web address given on the order, and that acceptance of the marine bunkers by the vessel would be deemed to constitute acceptance of these terms by buyer and seller. *Id.* OW Bunker Group's Terms and Conditions stated, in relevant part:

> The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Doc. 71, att. 6, art. P.5. They also provided:

> These Terms and Conditions are subject to variation in circumstances where the physical supply of the Bunkers is being undertaken by a third party which insists that the Buyer is also bound by its own terms and conditions. In such circumstances, these Terms and Conditions shall be varied accordingly, and the Buyer shall be deemed to have read and accepted the terms and conditions imposed by the said third party.

*Id.* at art. L.4(a).

OW Denmark ordered the oil from O.W. Spain, S.L. ("OW Spain), a Spanish member of the OW Bunker Group, which in turn ordered it from Macoil International, S.A. ("Macoil"). *See* doc. 71, atts. 9–11, 13; doc. 77, att. 2 (purchase orders and confirmations). The bunkers were delivered to the M/V Charana Naree in Gibraltar by Vemaoil Company Ltd., Macoil's delivery agent/subcontractor, on October 29, 2014. *See* doc. 71, att. 3, p. 12, ¶ 48; doc. 71, att. 12. Macoil's invoice, dated October 30, 2014, reflects an outstanding

debt of $200,488.71 owed by OWS Spain on the bunkers. *See* doc. 77, att 2. The terms and conditions on the reverse side of the invoice provide:

> The delivery of maritime fuel oil hereunder to any vessel shall create a valid maritime lien in favor of Seller or its Supplier. "The Romalpa clause to apply". (Until full payment of full amount is effected, it is agreed that the Buyer is in possession of Bunkers solely as bailee for the Seller) This agreement, its performance and enforcement (including enforcement of maritime liens arising hereunder) shall be governed and determined by the maritime law of Egypt. Any dispute, difference or question between the parties here to [*sic*] touching the construction meaning or effect of this agreement or the rights or liabilities of the parties hereunder or any matter arising out of the same or connected herewith shall be referred to the competent court of Egypt.

Doc. 77, att. 3, p. 3. As of the date these motions were filed, neither Macoil nor the OWS entities has been paid for the fuel oil and Copenship has gone bankrupt.

ING Bank N.V., a Dutch banking and financial services corporation, asserts that it is "an assignee of certain accounts, assets and maritime liens" of OW Denmark through a December 2013 security agreement with that company. Doc. 1. ING filed suit in this district, where the M/V Charana Naree was then docked, in 2016 in order to enforce its alleged lien against the vessel and its owner. Macoil has intervened in the action, asserting a competing lien as supplier of the bunkers. Doc. 29. It also brings a breach of contract claim against ING, as assignee of OW Denmark. *Id.*

ING and Macoil now move for summary judgment on Macoil's claim against the vessel. Docs. 71, 77. ING asserts that Macoil's role as supplier does not entitle it to a maritime lien under U.S. law, because it did not contract with either the vessel owner or charterer. Meanwhile, Macoil maintains that (1) Egyptian law governs this matter based on the choice of law provision in its invoice and (2) that law requires no direct contact for a

lien to arise in favor of a third-party supplier. PVL also opposes Macoil's Motion for Summary Judgment, arguing *inter alia* that Macoil's terms and conditions do not provide sufficient basis for the application of Egyptian law to this matter. Doc. 85. In the alternative, both PVL and ING assert, Macoil has not shown a sufficient basis under Egyptian law to support a maritime lien.

## II.
### SUMMARY JUDGMENT STANDARD

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

## III.
## LAW & APPLICATION

### A. Choice of Law

As an initial matter, the court must determine whether Macoil's right to proceed against the vessel is governed under U.S. or Egyptian law. "Under federal maritime choice of law rules, contractual choice of law provisions are generally recognized as valid and enforceable." *Great Lakes Reinsurance (UK) PLC v. Durham Auctions, Inc.*, 585 F.3d 236, 242 (5th Cir. 2009). Article L.4 of OW Bunker Group's Terms and Conditions provides a means by which the physical supplier's terms might vary the general terms of sale when the supplier "insists" on them. However, Macoil has not shown that it insisted on a change in the governing law or any other term. It relies on the Terms and Conditions printed on the back of its invoice to OWS Spain, issued on October 30, 2014 – the day after the bunkers were supplied to the vessel. *See* doc. 72, att. 12 (Vemaoil delivery receipt). There is nothing within OW Spain's order with Macoil to support that such a term was contemplated. There is also no signature from an OW Spain representative or any other basis from which to infer OW Spain's acceptance of the terms on Macoil's invoice. Moreover, as the Second Circuit recently noted in analyzing the same terms, Article L.4(a)

does not extend to varying the terms applicable to the vessel itself – in other words, it cannot be used to create entitlement to a maritime lien absent proof that the vessel owner knew of and accepted the terms. *ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 522 (2d Cir. 2018). So too here for Copenship, which encumbered the vessel in the first place through its purchase of fuel oil and failure to pay. The Egyptian choice of law provision thus has no binding effect on OW Spain, much less the vessel owner or charterer, and the court will analyze Macoil's right to a maritime lien by operation of U.S. law.[1]

## B. *Existence of a maritime lien*

"The purpose of maritime liens is to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more security can be given." *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov M/V*, 199 F.3d 220, 223 (5th Cir. 1999) (internal quotations omitted). Maritime liens arise only by operation of law and not by contract. *Bominflot, Inc. v. M/V Heinrich S*, 465 F.3d 144, 146 (4th Cir. 2006). Because they operate "to the prejudice of general creditors and purchasers without notice," they are "strictly construed" and not "lightly extended by construction, analogy or inference." *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979).

---

[1] Accordingly, the court will not examine Macoil's arguments about retention of title to the bunker under its terms and conditions or any of the other parties' remaining defenses to application of Egyptian law in this matter.

The statutory basis for maritime liens is the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*[2] CIMLA provides a maritime lien on a vessel for "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner[.]" *Id.* at § 31342(a). Accordingly, a maritime lien is not automatic for suppliers of "necessaries" but instead depends on the relationships between the parties involved. *Martin Energy Servs., LLC v. M/V Bourbon Petrel*, 2015 WL 2354217, at *7 (E.D. La. May 14, 2015) (citing *Lake Charles Stevedores, Inc.*, 199 F.3d at 229).

Two lines of cases address whether a physical supplier may assert a maritime lien: the general contractor/subcontractor line, shown in *Lake Charles Stevedores, Inc.*, supra, and the principal/agent line, shown in *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 896 F.2d 473 (9th Cir. 1988). *O'Rourke Marine Servs. LP, LLP v. M/V Cosco Haifa*, 179 F.Supp.3d 333, 337–38 (S.D.N.Y. 2016). Subcontractors "are generally not entitled to assert a maritime lien on their own behalf, unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Lake Charles Stevedores, Inc.*, 199 F.3d at 229. The principal/agent line of cases creates an additional exception, whereby physical suppliers in a line of agency relationships with the vessel can also assert a maritime lien. *M/V Cosco Haifa*, 179 F.Supp.3d at 338. In determining which theory, the court should remember that "it is not whether an intermediary can be expected to supply the necessaries itself . . . but rather the nature of

---

[2] This statute was originally enacted as the Federal Maritime Lien Act and recodified in 1989 as CIMLA. The amendments did not change the substance of the statute, and some opinions continue to use the Act's original title. *See, e.g.*, *Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063, 1068 & n. 4 (11th Cir. 2017).

the relationship between each pair of entities that are involved in the transaction at issue." *Lake Charles Stevedores, Inc.*, 199 F.3d at 230.

The record shows that Copenship, the time charterer of the vessel, ordered the fuel bunkers from OW Denmark. OW Denmark ordered the oil from OW Spain, which in turn ordered it from Macoil. "Each step in this supply chain involved a separate contract of purchase and sale; each step was carried out independent of [the vessel owner and charterer]," showing an independent contractor relationship. *M/V COSCO Haifa*, 179 F.Supp.3d at 338; *accord Valero Marketing & Supply Co. v. M/V Almi Sun*, 893 F.3d 290, 294–95 (5th Cir. 2018). The fact that the invoices were for different amounts further demonstrates that the entities were acting as contractors rather than principals/agents. *M/V COSCO Haifa*, 179 F.Supp.3d at 338.

Macoil notes that it was identified as supplier on the sales order confirmations, which were sent by OW Denmark and accepted by Copenship prior to the bunker deliveries. *See* doc. 71, atts. 4 & 5. It maintains that Copenship controlled its selection as supplier and likens this matter to *Martin Energy Services, LLC v. M/V Bourbon Petrel*, 2019 WL 2403145 (E.D. La. Jun. 6, 2019), *appeal docketed*, No. 19-30612 (5th Cir. Aug. 2, 2019). There Judge Fallon determined that the charterer had controlled the selection of the physical supplier based on evidence that the broker had communicated quotes from two suppliers to the charterer for each delivery and the charterer had instructed the broker to select the supplier with the lowest price. *Id.* at *5.

Here, on the other hand, there is no evidence of any election by Copenship as to the supplier. Instead, Macoil only shows that Copenship confirmed the order with knowledge

that Macoil would be supplier. "[M]ere awareness" of the supplier's identity is insufficient to support entitlement to a maritime lien. *Valero*, 893 F.3d at 294. There is no genuine dispute of material fact as to whether Macoil's selection or performance was controlled by Copenship or any other entity with authority, presumed or otherwise, to bind the vessel. Accordingly, there is no basis for finding a maritime lien established under CIMLA through Macoil's subcontractor relationship.

ING has successfully proven here and in all related cases that the physical supplier is not entitled to a maritime lien. As the Second Circuit recently observed, it is not difficult to sympathize with the physical supplier's position in this litigation. *M/V Temara*, 892 F.3d at 523. Though Macoil provided the necessaries in this matter and has more debt outstanding compared to the OW entities, it might now find itself with an uncollactable receivable. "But this result is a frequent one in insolvencies: an unsecured entity [such as Macoil], who took an unsecured credit risk, stands in line behind secured lenders." *Id.* Accordingly, Macoil's claim *in rem* fails as a matter of law.

## IV.
### CONCLUSION

For the reasons stated above, Macoil's Motion for Summary Judgment will be **DENIED** and ING's Motion for Summary Judgment will be **GRANTED**.

**THUS DONE AND SIGNED** in Chambers on this 5th day of March, 2020.

_____
**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**