UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | |
|---|---|
| **ING BANK, N.V.** | **CASE NO. 2:16-CV-01003** |
| **VERSUS** | **JUDGE JAMES D. CAIN, JR.** |
| **M/V CHARANA NAREE** | **MAGISTRATE JUDGE KAY** |

## MEMORANDUM RULING

Before the court are Motions for Summary Judgment filed, respectively, by plaintiff ING Bank N.V. [doc. 73] and defendant Precious Ventures, Ltd., the owner of the M/V Charana Naree [doc. 76]. Both motions relate to ING's claims for a maritime lien against the vessel, and both motions are opposed.

### I.
### BACKGROUND

This suit is one of several arising from the collapse of the O.W. Bunker Group, a global operation which supplied bunkers (fuel oil) to ships in international commerce. The present action relates to the M/V Charana Naree, a vessel sailing under the flag of Thailand, which is owned by foreign corporation Precious Ventures, Ltd. ("PVL") and was operated on a time charter by the Danish firm Copenship Bulkers A/S ("Copenship"). Doc. 76, att. 3, pp. 8–9; *see* doc. 33 (PVL corporate disclosure).

In October 2014, Copenship ordered bunkers from O.W. Bunker & Trading A/S ("OW Denmark") to refuel the vessel. The order was memorialized through a sales order confirmation and, after a change to the volume of fuel requested, revised sales order

confirmation issued by OW Denmark. *See* doc. 73, atts. 4 & 5 (sales orders). Both orders provided that the transactions were governed by OW Bunker Group's "Terms and Conditions of [S]ale(s) for Marine Bunkers," at a web address given on the order, and that acceptance of the marine bunkers by the vessel would constitute acceptance of these terms by buyer and seller. *Id.* OW Bunker Group's Terms and Conditions stated, in relevant part:

> The General Maritime Law of the United States shall always apply with respect to the existence of a maritime lien, regardless of the country in which Seller takes legal action. Seller shall be entitled to assert its rights of lien or attachment or other rights, whether in law, in equity or otherwise, in any jurisdiction where the Vessel may be found.

Doc. 73, att. 6, art. P.5.

OW Denmark ordered the oil from O.W. Spain, S.L. ("OW Spain"), a Spanish member of the OW Bunker Group, which in turn ordered it from Macoil International, S.A. ("Macoil"), a Liberian corporation. On October 29, 2014, the bunkers were delivered to the M/V Charana Naree in Gibraltar by Vemaoil Company Ltd. (Macoil's delivery agent/subcontractor). On that date OW Denmark issued an invoice to Copenship for $206,735.32, with due date of November 28, 2014. *See* doc. 73, att. 14. Since that time, Copenship has gone bankrupt and the invoice has not been paid. Doc. 73, att. 3, ¶ 75.

ING Bank N.V., a Dutch banking and financial services corporation, asserts that it is "an assignee of certain accounts, assets and maritime liens" of OW Denmark, "including the account receivable and corresponding maritime lien owned by the CHARANA NAREE." Doc. 1, ¶ 3. It purports to derive this status from a December 2013 security agreement, governed by English law, with OW Denmark. *Id.* at ¶¶ 4–6. On July 8, 2016, ING filed suit in this district, where the M/V Charana Naree was then docked. It seeks to

enforce its lien against the vessel and its owner, PVL. Doc. 1. Macoil has intervened in the action, asserting a competing lien under Egyptian law as supplier of the bunkers. Doc. 29. It also brings a cross-claim against ING, as assignee of OW Denmark, for breach of contract. *Id.*

ING now moves for partial summary judgment, asserting that it is entitled to judgment as a matter of law on its claim for a maritime lien against the Charana Naree. Doc. 73. PVL also moves for summary judgment, alleging that the assignment of maritime liens is invalid under English law and that ING therefore lacks standing. Doc. 76. It also asserts that there is no basis for U.S. law to apply to this matter but that, even if it did and the lien were found to have transferred under that law, ING would be estopped from enforcing it under the doctrine of laches. *Id.*; *see* doc. 76, att. 2. Finally, it argues that the *in rem* action is barred by a 2005 no-lien agreement between another OW member and an associated entity of PVL. *Id.*

**II.**
**SUMMARY JUDGMENT STANDARD**

Under Rule 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). He may meet his burden by pointing out "the absence of evidence supporting the nonmoving party's case." *Malacara v. Garber*, 353 F.3d 393, 404 (5th Cir. 2003). The non-moving party is then required to go

beyond the pleadings and show that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To this end he must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).

### III.
### LAW & APPLICATION

#### A. *Enforceability of Lien*

##### 1. *Existence of a lien under U.S. law*

ING asserts a maritime lien against the M/V Charana Naree, arising under U.S. law from OW Denmark's sale of fuel bunkers to Copenship. "The purpose of maritime liens is to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security can be given." *Lake Charles Stevedores, Inc. v. Professor*

*Vladimir Popov M/V*, 199 F.3d 220, 223 (5th Cir. 1999) (internal quotations omitted). Maritime liens arise only by operation of law and not by contract. *Bominflot, Inc. v. M/V Heinrich S*, 465 F.3d 144, 146 (4th Cir. 2006). Because they operate "to the prejudice of general creditors and purchasers without notice," they are to be "strictly construed" and not "lightly extended by construction, analogy or inference." *Atlantic & Gulf Stevedores, Inc. v. M/V Grand Loyalty*, 608 F.2d 197, 200–01 (5th Cir. 1979).

The statutory basis for maritime liens is the Commercial Instruments and Maritime Liens Act ("CIMLA"), 46 U.S.C. § 31301 *et seq.*[1] CIMLA provides a maritime lien on a vessel in favor of "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner[.]" *Id.* at § 31342(a). Accordingly, a maritime lien is not automatic for suppliers of "necessaries" but instead depends on the relationships between the parties involved.[2] *Martin Energy Servs., LLC v. M/V Bourbon Petrel*, 2015 WL 2354217, at *7 (E.D. La. May 14, 2015) (citing *Lake Charles Stevedores, Inc.*, 199 F.3d at 229). "The statute imposes no restriction on the nationality or other identity of the supplier or the vessel, and no geographic restriction on the place of provision of the necessaries." *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1129 (9th Cir. 2008).

"It is a fundamental tenet of maritime law that charterers and their agents are presumed to have authority to bind the vessel by the ordering of necessaries." *Triton*

---

[1] This statute was originally enacted as the Federal Maritime Lien Act and then recodified in 1989 as CIMLA. The amendments did not change the substance of the statute, and some courts continue to use the Act's original title. *See, e.g., Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063, 1068 & n. 4 (11th Cir. 2017).
[2] Neither party disputes that fuel oil is a necessary for the vessel or that a contractor need not have supplied the fuel itself to have a lien. *See* 46 U.S.C. § 31301(4) (noting that "necessaries" include "repairs, supplies, [and] towage"); *see also ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 520 (2d Cir. 2018) (collecting cases on contractor's right to assert lien based on subcontractor's provision of supplies or services).

*Marine Fuels, Ltd. v. M/V Pacific Chukotka*, 575 F.3d 409, 414 (4th Cir. 2009) (cleaned up); *see also* 46 U.S.C. § 31341(a). This presumption is not conclusive, however. It may be rebutted "by, for example, a showing that the provider of the necessaries had actual knowledge of a no-lien clause that prevented the entity ordering those necessaries from binding the vessel." *Lake Charles Stevedores, Inc.*, 199 F.3d at 225. PVL argues that this action violates a no-lien agreement between its parent company, Precious Shipping Public Company Limited Thailand ("PSL"), and OW Bunker Group. It also maintains that Copenship lacked authority to bind the vessel and that the OW Bunker entities were aware of this fact based on the communications to Vemaoil around the time of the transaction.

### a. *2005 PSL-OW Far East Agreement*

The first alleged no-lien agreement arose after PSL opposed demands for payment from OW Bunker Group for bunkers supplied to a PSL vessel ("M/V Apisara Naree") in 2003. That vessel was also operated under a time charter and had been refueled in South Africa by O.W. Bunkers Far East Pte Ltd. ("OW Far East," a Singapore-based OW Bunker Group member). Doc. 87, att. 2, ¶ 71. After the charterer failed to pay for the bunkers, OW Far East "passed" the file to OW Bunker Group and OW Bunker Group demanded payment from the charterer. Doc. 76, att. 3, p. 7. PSL assistant vice president Neelakantan Vasudevan then emailed Claus Mortensen, manager of OW Bunker Group's legal department, and asserted that a no-lien clause in its charter prevented OW Bunker Group from arresting the vessel. *Id.* at 3. After this dispute, PSL allegedly ceased doing business with OW Bunker Group when purchasing bunkers for its own account. Doc. 86, p. 2.

In June 2005, an exchange of emails took place between Kristian Nielsen, a representative of OW Far East, and PSL representative Pravin Naik. *See* doc. 76, att. 3, pp. 4–6; doc. 86, att. 1, p. 1. In that exchange Nielsen stated that he had consulted with Mortensen over the M/V Apisara Naree case. Nielsen clarified that the prospect of arrest had been called off before a warrant was issued. Doc. 86, att. 1, p. 1. He continued:

> We can assure you that any problems in the future will be discussed with you directly to avoid any delay in the vessel operation. As informed to you during the meeting we pay close attention to the fact that the vessel needs to proceed [with] the voyage under all circumstances.
> We hope that you will be willing to consider us for your future inquiries despite the misfortunate event.

*Id.*

PSL then agreed

> to reinstate O.W. BUNKERS as one of the bunker suppliers for PSL vessels on the explicit understanding that O.W. Bunkers will not approach PSL and/or arrest or cause to be arrested any vessel owned/operated by PSL for claims relating to bunkers supplied to PSL vessels on orders placed by the said vessels' time charterers and/or anyone other than PSL.

Doc. 76, att. 3, p. 4.[3] Nielsen replied, stating that "we hereby acknowledge that this will [be] the basis for any transaction between the parties." *Id.* at 5. Only Nielsen signed the

---

[3] ING objects that these emails are unauthenticated and that paragraphs of Mr. Vasudevan's declaration purporting to authenticate the emails should be stricken because they are not based on his personal knowledge. "At the summary judgment stage, evidence need not be authenticated or otherwise presented in an admissible form." *Maurer v. Indep. Town*, 870 F.3d 380, 384 (5th Cir. 2017). Instead, the court may consider evidence that would likely be admitted at trial "without imposing on parties the time and expense it takes to authenticate everything in the record." *Id.* (citing Fed. R. Civ. P. 56(c)(1)(A)). There is little question that PVL would be able to authenticate the emails – which, it appears, were contemporaneously forwarded to Mr. Vasudevan. Accordingly, the lack of authentication from either of the correspondents or a custodian of records does not serve as a barrier to consideration of this evidence.

emails sent on behalf of the OW Bunker entity, however, with his email address and signature identifying him as a representative OW Far East.

The parties dispute whether this agreement had any effect on ING's subsequent assertion of a lien against the M/V Charana Naree on OW Denmark's behalf. ING notes that Nielsen was employed as a bunker trader by OW Far East and only authorized to execute agreements on behalf of that entity. *See* doc. 87, att. 2, ¶¶ 69–70. PVL nevertheless maintains that Nielsen and OW Far East had apparent authority to bind other OW Bunker entities under the 2005 agreement, based on the history of the dispute and the representations described above.

"Maritime law embraces the principles of agency." *Cactus Pipe & Supply Co., Inc. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985). Under these principles, "[a]pparent authority is created as to a third person by conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to the act done on his behalf by the person purporting to act for him." *Id.* (citing Restatement (Second) of Agency § 27). A party relying on apparent authority is therefore required to show that (1) the principal's conduct caused it to believe that the agent had this authority and (2) as a direct consequence thereof, it reasonably relied on the agent's purported authority. *Armit v. Eleni Intern., Shipping*, 201 F.3d 556, 559 (5th Cir. 2000).

In support of its position PVL relies on the terms of the agreement and the history of the dispute, as memorialized in the correspondence described above. The 2003 dispute involved an attempt to enforce payment by OW Bunker Group and the terms of the 2005 agreement reference "O.W. BUNKERS" rather than just the Far East subsidiary. PVL

bases its belief on Nielsen's authority to enter into that agreement on an assumption that, because Mortensen/OW Bunker Group was involved in the original dispute, he would also be involved in or at least aware of OW Far East's negotiations to resume business.

It cannot be said, however, that OW Bunker Group obscured Nielsen's role. Nielsen is clearly identified as a representative of OW Far East in the 2005 correspondence, and neither Mortensen nor any other OW Bunker employee is even CC-ed on that communication. OW Far East, rather than any other OW Bunker Group member, was the entity involved in the 2003 refueling. There is no evidence relating to the involvement of any OW Bunker affiliate or employee other than Nielsen in the 2005 negotiations, and OW Bunker Group only appears to have become involved in the 2003 dispute when a delinquent account was passed to the legal department for further action.

OW Bunker Group's involvement in the 2003 dispute is insufficient to cloak OW Far East entities with authority to negotiate on behalf of the conglomerate. Accordingly, Nielsen's use of the term "OW BUNKERS" without any geographic modifier does not point to any manifestation on the part of OW Bunker Group or OW Denmark part that Nielsen should have authority to enter into a no-lien agreement behalf of any entity other than OW Far East. "An agent cannot confer authority upon himself," and so other entities cannot be bound based on evidence that Nielsen overstepped the limits of his authority. *Cactus Pipe & Supply Co.*, 756 F.2d at 1111–12. The 2005 agreement between OW Far East and PSL does not prevent ING from asserting a lien against the M/V Charana Naree.

### b. Copenship's authority to bind the vessel

Alternatively, PVL argues that no lien was created because the OW Bunker entities had notice that Copenship lacked authority to bind the vessel under the terms of its charter. To this end it shows that the master of the M/V Charana Naree sent an email to Vemaoil on October 27, 2014, through the vessel's agents in Gibraltar. The email stated that the vessel was subject to a "time charterparty agreement" between PVL, as owner, and Copenship, as charterer. Doc. 86, att. 1, p. 3. It further provided that, as an express term of the charter, any liens incurred by Copenship for necessaries supplied to the vessel were void. *Id.* That same day, Copenship sent a copy of the bunker stem confirmation to the vessel and its agents in Gibraltar. *Id.* at 4–6. These documents reflected that the bunkers were sold by Macoil, with OW Bunker as trader, for the account of Copenship. *Id.* After delivery of the bunkers to the vessel, the master of the Charana Naree stamped Vemaoil's delivery receipt with a disclaimer indicating that the goods were being accepted "solely for the account of the charterers" of the vessel and that "no lien or other device" could arise against the vessel based on that order. Doc. 87, att. 4, p. 26. ING provides a declaration from OW Bunker Group's Claus Mortensen stating that OW Denmark received and retained a copy of Vemaoil's delivery receipt but had no prior notice of Copenship's lack of authority to bind the vessel. Doc. 87, att. 2, ¶¶ 48, 63.

"[T]he statutory presumption in favor of a maritime lien is a strong one," and courts "are usually reluctant to conclude that a supplier has waived its lien." *M/V Bourbon Petrel*, 2018 WL 6104718, at *5 (quoting *Maritrend, Inc. v. Serac & Co. (Shipping) Ltd.*, 348 F.3d 469, 471 (5th Cir. 2003)). As long as the supplier relied on the credit of the vessel to some

extent, waiver will not be found. *Maritrend, Inc.*, 348 F.3d at 471. Accordingly, rebuttal requires proof of the supplier's actual knowledge that the charterer lacked the ability to bind the vessel. *World Fuel Svcs. Trading, DMCC v. Hebei Prince Shipping Co., Ltd.*, 783 F.3d 507, 522 (4th Cir. 2015). This is shown by an "affirmative communication by the Vessel or her Owner to one of the supplier's employees who has the ability to effect the negotiations and the contract **prior** to the time the contract is entered into." *O.W. Bunker Malta Ltd. v. M/V Trogir*, 2013 WL 326993, at *3 (C.D. Cal. Jan. 29, 2013) (citing *Gulf Oil Trading Co. v. M/V Caribe Mar*, 757 F.2d 743 (5th Cir. 1985)) (emphasis added). Actual notice conveyed only to the physical – rather than contract – supplier suffices to defeat a lien if the vessel owner has no knowledge of any other fuel supplier involved in the transaction. *Bomin Greece S.A. v. M/V Genco Success*, 2017 WL 2345709 (N.D.N.Y. May 30, 2017) (citing *Hampton Bermuda Ltd. v. M/V Star Siranger*, 2008 AMC 1352, 1359 (S.D. Tex. Aug. 18, 2008)).

On the facts presented to the court, the vessel provided actual notice of the "no-lien clause" to Vemaoil, delivery agent/subcontractor of Macoil. PVL provides nothing beyond speculation to support that this gave actual notice to Macoil, much less that the identity of the other parties to the transaction were obscured. Instead, the bunker stem forwarded to the vessel on October 27, 2014, clearly identified the roles of OW Bunker and Macoil. Doc. 86, att. 1, p. 5. There is no evidence that Vemaoil sent any of these receipts or correspondence to an OW entity before the bunkers were delivered. Furthermore, stamps affixed to bunker delivery receipts are generally insufficient to show actual knowledge of a no-lien provision by an employee with authority to impact contract negotiations prior to

the time the contract is entered into. *See, e.g.*, *M/V Trogir*, 2013 WL 326993, at *3 (collecting cases); *see also Ceres Marine Terminals, Inc. v. M/V Harmen Oldendorff*, 913 F.Supp. 919, 925–26 (D. Md. 1995) (no-lien stamp affixed by ship's master to labor slips after stevedoring services were provided insufficient to support actual notice on part of lienholder). ING has shown – and PVL does not produce any evidence to refute – that OW Denmark lacked "actual notice of the no-lien provisions in the charter party governing this transaction."[4] *World Fuel Svcs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F.Supp.3d 792, 809 (E.D. Va. 2014). Accordingly, the no-lien provisions do not defeat OW Denmark's right to assert a maritime lien against the M/V Charana Naree.

### 2. *Whether a lien arising from U.S. law may be enforced against the vessel*

As PVL notes, this action arises from the supply of fuel bunkers in Gibraltar to a non-U.S. flag vessel chartered by a non-U.S. entity from a non-U.S. vessel owner. The only basis asserted for the application of U.S. law, from which the maritime lien arises, is the choice of law clause in OW Bunker Group's Terms and Conditions. PVL does not dispute that this term was validly incorporated into the sales order confirmations between OW Denmark and Copenship or that these order confirmations became the contracts for sale of the bunkers. Instead, it maintains that the provision is unenforceable because (1) PVL was not a party to the contract and did not consent to this provision and (2) there is no justification for enforcing liens based in U.S. law against PVL outside of "[t]he mere

---

[4] To the extent that the parties should have been aware of such a provision based on prior dealings with PVL or related companies, this amounts only to constructive knowledge and is insufficient to defeat a maritime lien. *M/V Hebei Shijiazhuang*, 12 F.Supp.3d at 809.

-12-

fortuity of the vessel traveling to a United States port nearly two years after the bunkers were supplied in another country . . . ." Doc. 76, att. 2, p. 15.

PVL relies on *Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024 (2d Cir. 1973). There the Second Circuit refused to enforce a maritime choice-of-law provision in a contract against a vessel owner, who was not a party to the contract, on the grounds that the law chosen by the parties would adversely affect the rights of an entity that was not a party to the agreement. The Fourth Circuit directly rejected this reasoning, however, in *Triton Marine Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409 (4th Cir. 2009). As it noted, the action involved an *in rem* claim against the vessel rather than an *in personam* claim against the vessel owner. Accordingly, any question of fairness relates to the authority to bind the vessel itself – something presumptively granted to charterers under maritime law. *Id.* at 414.

The Fifth Circuit has endorsed the approach of the Fourth, noting that "there is nothing absurd about applying the law of the jurisdiction into which the ship sails, as the ship's presence in the jurisdiction represents a substantial contact." *World Fuel Services Singapore Pte, Ltd. v. Bulk Juliana M/V*, 822 F.3d 766, 773–74 (5th Cir. 2016) (quoting *Liverpool and London S.S. Protection and Indem. Ass'n Ltd. v. Queen of Leman M/V*, 296 F.3d 350 (5th Cir. 2002)). The court continued:

> Owners of ocean-going vessels are by their nature internationally oriented, sophisticated, and fully able to protect themselves contractually in their dealings with time charterers from any perceived unfairness by the possible enforcement of maritime necessaries liens in U.S. ports. Further, "recognition of freely negotiated contract terms encourages predictability and certainty in the realm of international maritime transactions."

*Id.* (quoting *Trans-Tec Asia v. M/V Harmony Container*, 518 F.3d 1120, 1131 (9th Cir. 2008)). Despite disagreement cited by PVL from other circuits and among legal scholars, the court finds no basis for declining to enforce the choice of law provision in this *in rem* proceeding.

### 3. Defenses to enforcement

#### a. Laches

"When a party unreasonably delays in asserting a maritime lien, the lien may be extinguished by the doctrine of laches." *World Fuel Svcs. Singapore PTE, Ltd. v. M/V Varesia*, 727 F. App'x 811, 816 (5th Cir. 2018). Laches is an equitable doctrine and provides a complete defense to a claim regardless of whether the applicable statute of limitations has run. *Mecom v. Levingston Shipbldg. Co.*, 622 F.2d 1209, 1215 (5th Cir. 1980). The Fifth Circuit uses a three-part test to determine whether laches applies to a maritime lien. To this end, it examines: (1) whether there was a delay in asserting the lien; (2) whether the delay was excusable; and (3) whether the delay resulted in undue prejudice to the party against whom the lien is asserted. *Id.*

"Courts regularly look to an analogous statute of limitations to guide the analysis of what constitutes an unreasonable or inexcusable delay." *M/V AS Varesia*, 727 F. App'x at 816. The statute of limitations in this matter began to run on November 29, 2014, when OW Denmark's invoice became past due. This action was filed on July 8, 2016. The analogous statute of limitations in this matter is Louisiana's three-year prescriptive period for actions on an open account. La. Civ. Code art. 3494(4); *see, e.g., Galehead, Inc. v. M/V*

*Negril Bay*, 1999 WL 397950, at *3 n. 5 (E.D. La. Jun. 14, 1999). Accordingly, the matter is timely under comparable state law.

The limitations period is not dispositive, however, in determining whether laches exists. *Akers v. State Marine Lines, Inc.*, 344 F.2d 217, 220 (5th Cir. 1965). Instead, it governs where the burden falls in proving delay and resulting prejudice. *Barrois v. Nelda Faye, Inc.*, 597 F.2d 881, 884 (5th Cir. 1979). When the plaintiff files suit within the analogous period, the defendant must show inexcusable delay and resulting prejudice in order to establish a laches defense. *Id.*

PVL complains that OW Bunker/ING made no demand for payment until after Copenship filed for bankruptcy protection in February 2015. Doc. 76, att. 3, p. 9.[5] As it notes, the Second Circuit has found prejudice justifying laches on this basis when the bankruptcy "eliminated a number of otherwise reasonable means of repayment" for the defendant. *Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174 (2d Cir. 2018). Whatever the prejudice, however, PVL fails to show adequate delay. To the extent PVL is complaining that OW Denmark did not seek payment within three months of its invoice becoming overdue, it has produced no evidence or case law to support that such a delay is unreasonable. *Compare Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 2016 WL 3144058, at *3 (S.D.N.Y. Apr. 8, 2016) (finding inexcusable delay where contractor did not make formal demand for payment until charterer went bankrupt, more than a year

---

[5] This assertion is drawn from a portion of Mr. Vasudevan's declaration. ING also objects to this portion, arguing that he has not shown that his statements are based on personal knowledge. Mr. Vasudevan has identified himself as the vice president of the "risk management team" for PSL, "a related company of [PVL.]" For purposes of this motion, the court will assume that this is a position dealing with the company's financial exposure and that Mr. Vasudevan is speaking based on personal knowledge.

after invoice became overdue). To the extent the claimants might have delayed thereafter, PVL has admitted that the M/V Charana Naree did not enter the territorial waters of the United States betweenits refueling on October 29, 2014, and July 6, 2016. Doc. 87, att. 3, pp. 1–2. "[F]ailure to arrest a vessel in a foreign port does not amount to a lack of diligence," and there is no statutory requirement that a maritime lien be filed in order to be valid. *M/V Negril*, 1999 WL 397950, at *2. ING did not unreasonably delay by waiting until the M/V Charana Naree entered a United States port to attempt enforcement of its lien rights. PVL's laches defense therefore fails as a matter of law.

### B. *Transfer of Lien*

The parties next dispute whether the maritime lien could be transferred through OW Denmark's assignment of rights to ING. This transfer occurred through the December 2013 security agreement, which provides that it is governed by English law. *See* doc. 73, att. 18, p. 32. PVL argues that "there is a long established view [under English law] that a maritime lien is a personal and non-transferable privilege," and that ING therefore lacks standing to bring this suit. Doc. 76, att. 2, p. 10 (citing D.R. THOMAS, BRITISH SHIPPING LAWS VOL. 14 MARITIME LIENS (1980)).

In *Barcliff, LLC v. M/V Deep Blue*, 876 F.3d 1063 (11th Cir. 2017) and *ING Bank v. M/V Temerara*, 342 F.Supp.3d 558 (S.D.N.Y. 2018), the parties raised these arguments against virtually identical security agreements between ING and OW Bunker members. As both courts observed and as expert opinions in this matter confirm, the English principles

of contract law are substantially similar to those used under U.S. law.[6] Namely, the court must "consider[] the contract as a whole, construing [it] so as to make business commonsense." *M/V Temerara*, 342 F.Supp.3d at 561.

Under § 2.3(a) of the Security Agreement, OW Denmark assigned all "rights, titles and interest in respect of the Supply Receivables" to ING. "Supply Receivables" are defined as "any amount owing, or to be owed, to a Receivables Chargor . . . under a Supply Contract." Doc. 73, att. 18, p. 10. The clause contains no limitations to rights recognized under English law, and OW Bunker Group's Terms and Conditions clearly provide for the application of United States law to the creation of maritime liens. Maritime liens are also generally recognized as assignable. *M.V Deep Blue*, 876 F.3d at 1074–75 (citing Thomas J. Schoenbaum, 1 Admiralty and Maritime Law § 9-1 (5th ed.)). The category of rights "in respect of" a debt contemplates a wider concept than rights "under" a debt and would include maritime liens arising from that obligation. *M/V Temara*, 342 F.Supp.3d at 562–63; *see also* doc. 73, att. 18, p. 7. Because the whole purpose of the lien is to secure the debt, it is "only reasonable" that the lien – as security on that debt – would be assigned along with it. *M/V Deep Blue*, 876 F.3d at 1075.

---

[6] Solicitor Antony James Zacaroli, QC provided declarations for ING in other OW Bunker group cases, and his opinion was relied on by the courts in *M/V Deep Blue* and *M/V Temerara*. Solicitor Jennifer Marshall, QC has provided an opinion in this case on the transfer of lien issue. *See* doc. 73, att. 19. She confirms the application of Zacaroli's opinions to this matter and explains his unavailability to give an opinion here, based on a recent judicial appointment. *Id.*; *see also* doc. 73, atts. 20 & 21 (original and supplemental Zacaroli declarations).

## C. Extension of lien to interest and attorney fees

Based on the terms of Copenship's agreement with OW Denmark, ING has made a claim for contractual interest of three percent per month on the unpaid invoice and attorney fees and costs incurred in attempts to collect on the invoice. Doc. 1, ¶¶ 18–20. At the time the complaint was filed in 2016, ING estimated these amounts at $206,735.32 on the unpaid invoice, $158,623.20 in accrued interest, $50,000.00 in accrued and anticipated attorney fees, and $539.89 in administrative fees. *Id.*

PVL argues that even if the lien is valid and assignable, it does not extend to claims for contractual interest and attorney fees. ING now concedes that it is not entitled to recover attorney fees or administrative fees in this matter but maintains that it is entitled to prejudgment interest at the rates set forth above. Barring that, it requests prejudgment interest at Louisiana's judicial rate.[7] Doc. 87, pp. 27–29.

The court has discretion to award pre-judgment interest under a CIMLA maritime lien; indeed, granting such an award is "almost automatic."[8] *Triton Marine Fuels, Ltd. v. M/V Pacific Chukotka*, 671 F.Supp.2d 753, 764 (D. Md. 2009) (internal quotations omitted). The contractual rate of interest is just a starting point, however. The district court

---

[7] ING originally moved for partial summary judgment, asking only for a ruling on the enforceability of its maritime lien. Doc. 73. Since PVL has raised the issue of costs and interests, however, ING has also addressed its entitlement to same. Accordingly, it seems all issues between these parties may now be addressed through the cross-motions for summary judgment.

[8] To deny prejudgment interest, the court must find circumstances that would make it inequitable for the losing party to pay. *First Bank & Tr. v. Knachel*, 999 F.2d 107, 108 (5th Cir. 1993). These include "an unwarranted delay in bringing suit, a damages award substantially less than that sought, a genuine dispute regarding liability, complex legal and factual issues, and a bad faith claim." *World Fuel Svcs. Trading, DMCC v. M/V Hebei Shijiazhuang*, 12 F.Supp.3d 810, 814 (E.D. Va. 2014) (internal quotations omitted). PVL concedes, however, that to the extent a maritime lien exists it does cover "some" prejudgment interest in this matter. Doc. 76, att. 2, p. 18.

is only obligated to award interest at a rate necessary to compensate the provider of necessaries for its losses. *See id.* at 764–65. In determining the appropriate rate, the court has broad discretion and may also look to "the judgment creditor's actual cost of borrowing money, to state law, or to other reasonable guideposts indicating a fair level of compensation." *Offshore Marine Contractor, Inc. v. Palm Energy Offshore, LLC*, 779 F.3d 345, 351 (5th Cir. 2015).

The contractual interest rate is 36 percent per year. ING presents no justification for such a windfall. As an alternative it proposes Louisiana's judicial interest rate, which is currently set at 5.75 percent per year. *See* La. Rev. Stat. § 13:4202(B)(1). PVL makes no objection, and this rate appears better suited to compensate ING for "the loss of the use of money over time."[9] *M/V Hebei Shijiazhuang*, 12 F.Supp.3d at 815 (internal quotations and alterations omitted). Prejudgment interest should commence from the date of loss, i.e. the date the invoices became overdue. *Id.* Accordingly, the court will award prejudgment interest at a rate of 5.75% per year from November 29, 2014, onward.

---

[9] It is also closely related to the prime rate, a common benchmark for prejudgment interest in maritime cases. *M/V Hebei Shijiazhuang*, 12 F.Supp.3d at 815; *see* La. Rev. Stat. § 13:4202(B)(1).

## IV.
### Conclusion

For the reasons stated above, Precious Ventures, Ltd.'s Motion for Summary Judgment [doc. 76] will be **DENIED** and ING's Motion for Summary Judgment [doc. 73] will be **GRANTED**, reflecting ING's entitlement to a maritime lien over the M/V Charana Naree in the amount of $206,735.32, and prejudgment interest at 5.75% per year from November 29, 2014, onward. PVL and ING will be directed to submit a proposed judgment on the final amount owed in accordance with above ruling.

**THUS DONE AND SIGNED** in Chambers on this 5th day of March, 2020.

**JAMES D. CAIN, JR.**
**UNITED STATES DISTRICT JUDGE**